**William BULGER, Petitioner-Appellee,**

**v.**

**Robert E. McCLAY, Superintendent, Arthur Kill Correctional Facility, and Benjamin Ward, Commissioner, New York State Department of Correctional Services, Respondents-Appellants.**

**No. 833, Docket 78–2009.**

United States Court of Appeals, Second Circuit.

Argued April 21, 1978.

Decided May 4, 1978.

Jonathan J. Silbermann, New York City (Martin Erdmann, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for petitioner-appellee.

A. Seth Greenwald, Asst. Atty. Gen., New York City (Samuel Hirshowitz, Asst. Atty. Gen., New York City, of counsel), for respondents-appellants.

Before KAUFMAN, Chief Judge, LUMBARD and SMITH, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The remarkable institution known as the Anglo-American jury is such a commonplace of our judicial structure that we have perhaps become dulled to its primary characteristics. But, as Justice Holmes observed over half a century ago in *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907), one of the precepts of our system is that the "conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." The issue presented by this case is whether, in derogation of this basic tenet, the jurors at appellee's state court trial improperly considered evidence *dehors* the record.

I.

In October of 1975, William Bulger was brought to trial in the Supreme Court of Richmond County on charges of petit larceny and burglary in the third degree. The state, primarily through the testimony of Carol Perine, an eyewitness, sought to prove that Bulger was involved in the Sep-

tember 24, 1974 theft of ten cartons of cigarettes and a quantity of change from a grocery store located on the corner of Heberton and Post Avenues, Port Richmond, Staten Island. Perine, who lived across from the store, testified that she was awakened by a loud noise during the night of September 24. Looking out of her window, she saw a dark-haired fellow, subsequently identified as Thomas Sigman, crawl through a hole in the glass door of the store and hand a brown paper bag to Bulger. Sigman then left the store, taking the bag from Bulger and secreting it under a car. As she was observing the pair, Perine called the police. In fact, two police officers arrived on the scene shortly after Bulger and his companion had walked to a bus stop on the corner and were waiting there. Perine testified, and her testimony in this regard was corroborated by Officers Robert Prather and Allen Simon, that one of the two men told the police that he was just waiting for the bus.

On cross-examination, Perine was confronted with her prior statements elicited at a preliminary hearing and before the grand jury, when she stated that Bulger had been standing near a street light, and had never left the light pole. She then admitted, "This is like a year ago, now. I, you know, each time I've been very nervous and I—I don't remember really." Bulger did not testify and his home address was never a part of the trial record.

By the conclusion of the trial, it was apparent that Bulger's justification for being in the area was an issue of some significance, and the District Attorney, in summation, stressed the meritlessness of Bulger's excuse:

> So what's the reason for him standing on the bus corner? He said I am going to work; that's his story, believe it or not, it's up to you, you got to believe that at four in the morning he's standing with a dark-haired fellow and they are going to work.

Following the closing, which preceded a weekend recess, Justice Barlow cautioned the jurors not to read any newspaper accounts of the case.

On Monday, October 27, the jury deliberated for five hours, and indicated they were unable to reach a verdict. A modified Allen charge was then given, and one and a half hours later, the jurors found Bulger guilty of burglary in the third degree. Apparently spurred by the jurors' evident difficulty in arriving at a verdict, Bulger's counsel questioned individual jurors as they left the courtroom. In a post-trial affidavit, the attorney stated that in one such conversation with Juror # 4, a Mr. Moran, he admitted to counsel that he had changed his vote after one of the other jurors mentioned the contents of a newspaper article published over the weekend. That story contained Bulger's address, which it set forth as quite distant from the scene of the crime, and, accordingly, rendered Bulger's excuse for being in the area highly improbable. Based on this disclosure, Bulger's counsel moved for a hearing and a new trial on the ground that prejudicial, extra-record information had tainted the jury's deliberations.

In response to the motion, the trial judge, Justice Barlow, called Moran and questioned him under oath. The juror then indicated that Bulger's home address was not mentioned during deliberation. After Justice Barlow had established this fact to his own satisfaction, he did not allow defense counsel to cross-examine Moran although such a request had been made. Justice Barlow then denied the motion for a new trial. Bulger promptly appealed, arguing that the failure to hold an adequate hearing violated his constitutional rights to due process and confrontation. The judgment of conviction was affirmed by the Appellate Division without opinion and, on June 28, 1976, leave to appeal to the Court of Appeals was denied.

On May 31, 1977, Bulger filed a petition for a writ of habeas corpus in the federal court, claiming that the introduction of extra-record information violated his Sixth Amendment and due process rights. A hearing on the question was held on September 16, 1977 before Judge Weinstein.

At the hearing, juror Francis Johnston testified that, during deliberations, one of the jurors mentioned Bulger's home address and that "it became a subject of heated discussion." Johnston could not recall, however, whether the information came from a newspaper article or some other source. Juror Moran, although subpoenaed to appear, failed to do so. In addition to Johnston's testimony, the parties stipulated that Bulger's address was not introduced at trial and that a newspaper article, appearing on the Saturday preceding the jury's deliberations, revealed Bulger's place of residence.

On the facts before him, Judge Weinstein found that the state court had failed to give Bulger an adequate hearing. Rather than decide the constitutional issue of jury prejudice on the merits, Judge Weinstein chose to afford the state judge an opportunity to correct his error. Accordingly, Judge Weinstein directed that a writ of habeas corpus would be granted if the state court did not hold a post-verdict hearing on the motion to set aside the verdict in 60 days. When the state court failed to afford this hearing within the requisite period, Judge Weinstein granted the writ on November 30, 1977, conditioned, of course, on the state court's failure to retry Bulger within 60 days.

In elaborating his reasons for granting the writ, the district judge found that the state court hearing was inadequate; that the jurors learned of Bulger's address during deliberations; and that this information was no doubt critical to the determination of guilt. Rather than premise the constitutional violation on the due process clause, Judge Weinstein based his holding on an equal protection rationale. He reasoned that Bulger had been deprived of New York State's strict rule interdicting the admission of information *dehors* the record and, consequently, the state procedures utilized violated the Equal Protection clause of the Constitution.

Subsequent to Judge Weinstein's decision, the state trial judge filed a written memorandum, reaffirming the denial of any hearing more extensive than the one originally granted. Justice Barlow, based only on the transcript in the federal court proceedings, found Johnston's testimony incredible, and reasserted his belief in Moran's views. The State then moved for reconsideration of the district court's opinion, and its motion was denied in a memorandum and order dated December 19, 1977.

## II.

■ Before proceeding to the substantive constitutional issue, we must, in the interests of comity, consider whether Bulger was afforded a full and fair opportunity to litigate his constitutional claim in state court, and thereby is precluded from seeking federal relief. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).[1] Certainly, there is little doubt that the hearing conducted by Justice Barlow was neither full nor fair. *See Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Suggs v. LaVallee*, 570 F.2d 1092 at 1111 (2d Cir., 1978). Justice Barlow's examination of juror Moran was, at best, cursory, particularly in light of the serious questions raised by the affidavit of Bulger's defense counsel. And the refusal of Justice Barlow to allow any cross-examination only exacerbated the inadequacy of his own examination. Moreover, Justice Barlow did not make any effort whatsoever to determine which of Moran's representations were credible by questioning other jurors.

Nor does the fact that Bulger raised the issue of the inadequacy of the state hearing on appeal in the state courts preclude federal relief. The appellate proceedings, standing by themselves, fell far short of the full and fair opportunity to litigate contemplated by *Stone*. There is not the slightest

---

1. The extent to which *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) reaches beyond the context of the Fourth Amendment is by no means clear. *See The Supreme Court, 1975 Term*, 90 Harv.L.Rev. at 217 (1976). We merely point out that, when measured by the standard of *Stone*, Judge Weinstein demonstrated an appropriate sensitivity to the interests of comity.

indication that the state courts gave any scrutiny to the claim. The Appellate Division affirmed without opinion, and the Court of Appeals did not grant leave to appeal. This silence in the face of a substantial constitutional question suggests a serious void in the appellate process. *See Gates v. Henderson*, 568 F.2d 830, 837 (2d Cir. 1977); *Frank v. Mangum*, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915).

Finally, Judge Weinstein gave the state a second opportunity to hold an adequate hearing, but Justice Barlow remained adamant in his refusal to do so. Instead, he merely reiterated his earlier findings, going so far as to pass upon the credibility of a witness who had never appeared before him. Under these circumstances, the state procedures were so defective as to warrant federal intervention.

### III.

Having found that Judge Weinstein properly exercised jurisdiction, we do not have any difficulty with his determination that the jurors' consideration of extrinsic information violated the Constitution. While the thirteenth century jury may well have been selected for its familiarity with the facts in a particular case, the modern jury is instructed to reach its verdict solely on the basis of the evidence before it. *See Irwin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). This sensitivity to the source of information brought into the jury room is grounded in the unremarkable perception that all evidence developed against an accused must "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965). It does not matter whether the "taint" of outside influence derives from pervasive adverse prejudicial publicity which cannot be obliterated from the jurors' minds, *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) or the ill-chosen remarks of a bailiff, *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

In determining specifically whether the introduction of extrinsic evidence warrants habeas corpus relief, the starting point must be the opinion of Judge Friendly in *United States ex rel. Owen v. McMann*, 435 F.2d 813 (2d Cir. 1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1972). In *Owen*, several of the jurors mentioned that they knew "all about Owen," and introduced in their deliberations the facts that Owen's father was constantly getting him "out of trouble"; that Owen had been suspended from the police force in connection with the unauthorized use of a prowl car; and that he had been involved in a tavern fight. Finding that specific extra-record facts had been discussed and that there was a significant possibility of prejudice, we held that Owen's due process rights had been violated. *Id.* at 818.

■ There is certainly an adequate basis for Judge Weinstein's finding in this case that crucial information not in the trial record was discussed by the jurors in their deliberations. Juror Johnston testified before Judge Weinstein that Bulger's residence had been an important subject of discussion during jury deliberations; the district court also had before it Bulger's attorney's affidavit attesting to juror Moran's statement to a similar effect. Their statements, coupled with the intervening newspaper article reporting the address, were sufficient to establish that the information was impermissibly imparted to the jury and discussed by its members, although it had been absent from the trial record.

Nor is there any real question that Bulger was prejudiced by the jury's discussions of this extraneous evidence. The discovery by the jurors that Bulger lived a good many miles from the scene of the burglary certainly tended to discredit his excuse for being at the bus stop. Moreover, the jurors were obviously troubled by the case and by the inconsistencies and uncertainties in Ms. Perine's testimony, as was indicated by their difficulty in reaching a verdict. We have little doubt that the knowledge of

Bulger's address may well have been determinative.[2]

## IV.

The jury, of course, is not a sterile institution in our judicial structure. It would be naive to suggest that individual jurors leave all their preconceptions, values and insights on the doorstep when they enter the jury room. Indeed, we encourage jurors to bring their experiences to bear during deliberation. The line between this permissible activity and the consideration of improper evidence is seldom clear. Yet, where specific facts enter the crucible of decision without appropriate safeguards, the constitutional role of the jury is undermined, and the defendant is denied the fair trial which is his constitutional due.

Affirmed.

**2.** We do not agree with Judge Weinstein's rationale concerning the denial of Bulger's equal protection under the laws; such an approach would suggest that every deviation from state law and procedure might be claimed to be a constitutional violation warranting habeas corpus relief.