Nancy C. COCCONI, Susan M. Green, Marilyn J. Roberts and Gloria J. Trujillo, Plaintiffs,

v.

PIERRE HOTEL, Defendant.

No. 00 CIV. 361(CSH).

United States District Court, S.D. New York.

June 25, 2001.

Lewis, Greenwald, Clifton & Nikolaidis (Hope Pordy, of counsel), New York City, for Plaintiffs.

Kane Kessler, P.C. (Jeffrey H. Daichman, of counsel), New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Plaintiffs Nancy Cocconi, Susan Green, Marilyn Roberts, and Gloria Trujillo brought this action against the Pierre Hotel for gender-based discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a), Section 296 of the New York State Human Rights Law, and Section 8–107(a) of the New York City Human Rights Law. The case was tried before a jury from February 6 to February 15, 2001, and the jury returned a verdict in defendant's favor on all claims. Plaintiff Nancy Cocconi now moves the court to set aside the judgment and grant a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure on the ground that the jury received extraneous information that was highly prejudicial to plaintiff. For the reasons that follow, plaintiff's motion is denied.

### BACKGROUND

At trial, plaintiffs endeavored to prove that the Pierre Hotel did not hire them as banquet servers because of their gender. In late summer of 1998, the Pierre Hotel interviewed 37 applicants, 30 men and 7 women, for six banquet waiter positions. From that group, six men were hired. Plaintiffs presented evidence at trial intended to show that the Pierre Hotel had hired very few women as banquet servers in the past, that plaintiffs were treated differently in their interviews and were evaluated by different standards than their male counterparts, and that plaintiffs had significantly more experience as banquet servers than the male applicants who received job offers. Defendant presented evidence purporting to show that plaintiffs were treated similarly to male applicants in their interviews, that the successful applicants presented themselves better than plaintiffs did in their interviews, and that the interviewer generally gave great weight to prior experience at the Pierre Hotel, even in positions other than banquet server. At the end of the trial, the jury returned a verdict for defendant.

Following the verdict, counsel for plaintiffs and counsel for defendant approached the jurors and talked with some of them. Juror Number 1 and Juror Number 6 told counsel for plaintiffs that Juror Number 9, characterized by counsel as a "corporate travel consultant," communicated her personal knowledge of the New York hotel industry to the jury. In particular, they said that Juror Number 9 told the jury that the hotels in which Cocconi had worked, including the Roosevelt Hotel, the

Algonquin Hotel, and the Hilton Hotel, were not of the same quality as the Pierre Hotel. The jurors also discussed with counsel for plaintiffs their level of familiarity with the hotel industry and the extent of their reliance on the information communicated by Juror Number 9.[1]

Counsel for plaintiff called these events to the Court's attention in a letter. Upon learning of counsels' conversations with jurors, the Court on February 28, 2001, ordered the parties to refrain from further contact with jurors without special permission from the Court. In its order, the Court withheld judgment as to whether any post-verdict relief would be warranted. Soon thereafter, plaintiff Cocconi filed this motion to set aside the verdict and grant a new trial on the grounds that extraneous, prejudicial information was communicated to the jury. Plaintiff's motion was filed within ten days of the entry of judgment, as required by Rule 59(c).

### DISCUSSION

Courts have the responsibility to ensure that parties to litigation are afforded a fair trial, with a verdict based only on properly admitted evidence. *See Bulger v. McClay*, 575 F.2d 407, 408 (2d Cir.1978) ("[O]ne of the precepts of our system is that the 'conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.' "), *quoting Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907) (Holmes, J.). Courts are ordinarily reluctant, however, to probe a jury's deliberative process to examine the basis for a jury's verdict. *See Ohanian v. Avis*

*Rent A Car System, Inc.*, 779 F.2d 101, 110 (2d Cir.1985) (noting that courts should not "make what was intended to be a private deliberation, the constant subject of public investigation"), *quoting McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983) ("It hardly bears repeating that courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."); *see also United States v. Shakur*, 723 F.Supp. 925, 935–36 (S.D.N.Y.1988) (Haight, J.), *aff'd*, 888 F.2d 234, 237 (2d Cir.1989).

■ Rule 606(b) of the Federal Rules of Evidence strikes a balance between the responsibility to ensure a fair trial and the policy against interference with jury deliberations. A court may consider testimony from trial jurors "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed.R.Evid. 606(b). Furthermore, if a court is aware of clear evidence that the jury was exposed to extraneous prejudicial information, the court can authorize limited investigations or hearings to confirm exactly what information was communicated to the jury so that it may determine whether a new trial is warranted. *Moon*, 718 F.2d at 1234 ("[A] trial court is required to hold a post-trial jury hearing only when .... there is clear, strong, substantial and incontrovertible evidence, that a specific non-speculative impropriety has

---

1. The affidavit submitted by counsel for plaintiff declares, "The particular quality of these hotels was not common knowledge among the jurors. Indeed ... the jury foreman ... stated to me that the other jurors were not familiar with the hotels, and that the jury relied on Juror No. 9's knowledge and experience in this regard." Affidavit of Hope Pordy, dated Mar. 6, 2001, ¶ 5. For reasons explained *infra*, I do not take into consideration this evidence of the jurors' mental processes.

occurred which could have prejudiced the trial of a defendant.") (citations omitted). On the other hand, trial jurors may not testify as to "the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith," nor may evidence from any other sources on that point be considered. Fed.R.Evid. 606(b). If it is shown that extraneous information was brought to jurors' attention, the court assesses the prejudicial impact of the information by an objective standard. *Bibbins v. Dalsheim,* 21 F.3d 13, 17 (2d Cir.1994) ("Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.") (citation and internal quotation marks omitted); *see also United States v. Greer,* 223 F.3d 41, 55 (2d Cir.2000) (finding that extrinsic information would not have influenced "hypothetical average juror").

Therefore, I will consider evidence submitted by plaintiff regarding information communicated by Juror Number 9 to the jury, but I will not consider evidence submitted by plaintiff regarding the effect of that information on the mental processes of other jurors. *See Bibbins,* 21 F.3d at 18 ("Petitioner argues that a finding of no actual prejudice is incompatible with Mr. Urban's affidavit, which expressly states that he was swayed by the introduction of extraneous information. This argument is necessarily grounded in state evidentiary rules, as the Federal Rules of Evidence

preclude consideration of a juror's mental processes."). Plaintiff necessarily presents hearsay evidence, the affidavit of counsel, because the Court did not give her permission to contact the jurors again to obtain affidavits. Since I find that the extraneous information that plaintiff alleges reached the jury was not prejudicial, there is no need to hold a hearing or otherwise obtain direct testimony from jurors to confirm plaintiff's allegations.

The determination whether to grant a new trial because of the jury's exposure to extraneous information depends not on "the mere fact of infiltration of some molecules of extra-record matter ... but the nature of what has been infiltrated and the probability of prejudice." *United States ex rel. Owen v. McMann,* 435 F.2d 813, 818 (2d Cir.1970); *see also Bibbins,* 21 F.3d at 17; *Greer,* 223 F.3d at 55.[2] The assessment of prejudice is highly dependent on the particular facts of the trial at issue, but decisions in prior cases offer some guidance. *See Moon,* 718 F.2d at 1234 ("Although the circumstances in the decided cases are instructive, each situation in this area is *sui generis.*").

The opinion in *Owen v. McMann,* written by Judge Friendly, is frequently cited on the subject of extraneous information in the jury room. In that case, several jurors were familiar with the reputation of one of the defendants and shared their knowledge with the other members of the jury. The court summarized the extraneous in-

**2.** In criminal cases, there is a presumption that extraneous information communicated to the jury is prejudicial, but this presumption can be overcome through a showing by the government that the information is harmless. *Greer,* 223 F.3d at 54, *citing Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). While the Second Circuit has not squarely addressed the issue, other

circuits have held that the same presumption of prejudice applies in civil cases. *Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532, 1535 (4th Cir.1986); *Hobson v. Wilson,* 737 F.2d 1, 47–48 (D.C.Cir.1984); *Krause v. Rhodes,* 570 F.2d 563, 568 (6th Cir.1977). In any event, defendant has made a sufficient showing of harmlessness, as discussed *infra,* to overcome any such presumption.

formation communicated to the jury as follows:

> In substance, the jurors or some of them were told by other jurors during the trial and the deliberations; that the defendant had been in trouble all his life; that he had been suspended from the police force in connection with the unauthorized use of a prowl car; that he had been involved in a fight in a tavern; that one of the juror's husband was an investigator and that he knew all about plaintiff's background and character, which was bad; and that petitioner's father was always getting him out of trouble.

435 F.2d at 815. The court noted that while the modern juror must reach a verdict based on evidence presented at trial, the traditional role of the juror as the voice of the community still has some validity, and due process would not be violated just because "jurors with open minds were influenced to some degree by community knowledge that a defendant was 'wicked' or the reverse." *Id.* at 817. The court distinguished general experience from specific facts and then concluded:

> Owen's case falls on the impermissible side of this by no means bright line, although perhaps not by much. On the basis of the judge's findings, the jurors' statements went beyond Owen's being something of a ne'er-do-well; they included allegations of at least two specific incidents which had not been and probably could not have been received in evidence, and which Owen had had no opportunity to refute.

*Id.* at 818–19.

*Bibbins v. Dalsheim* involved a state prisoner's habeas corpus petition under 28 U.S.C. § 2254. "A few minutes after a street sale of cocaine to an undercover agent, police spotted Bibbins across the street and arrested him because he fit the description of the seller." 21 F.3d at 14.

Following his conviction, Bibbins argued to the state court and later on habeas corpus that "[o]ne juror told the others that she was a resident of the area in which the transaction and arrest took place and that there were no open places of business there." *Id.* Bibbins offered proof, in the form of juror affidavits, "that this statement influenced at least one other juror to render a guilty verdict on the theory that the absence of other people made the street identification of the defendant more compelling." *Id.*

The district court denied relief. On appeal, the Second Circuit applied Rule 606(b) and disregarded the jurors' descriptions of the effect the extraneous statement had upon them. "Even when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." *Id.* at 17. Instead, the court applied the objective test and affirmed the denial of habeas relief.

It is instructive to consider the *Bibbins* court's rationale in some detail. First, the Second Circuit concluded that "there was no juror misconduct." *Id.* at 14. The court explained that general knowledge about the community is not the sort of extraneous information that must be excluded from the jury room:

> Ms. Krainak's observation concerning the life of this community is part of the fund of ordinary experience that jurors may bring to the jury room and may rely upon, in the same way that another juror may know that Times Square is busy all night or that there are doormen along stretches of Park Avenue.

*Id.* at 17 (citing *McMann,* 435 F.2d at 817).

Second, the court held that the information about the scene of the crime "would

have had no substantial and injurious influence on a reasonable jury." *Id.* at 14. First, the information was cumulative; there was a photograph in evidence showing that shops in the vicinity were boarded up. *Id.* at 17 ("We think this information insufficiently prejudicial to warrant a writ of habeas corpus. To begin with, the extra-record information provided by Ms. Krainak was cumulative. The State introduced into evidence a photograph showing that the shops in the vicinity were boarded up. Ms. Krainak's personal observation to the same effect revealed little that could not be seen in the photograph."). Furthermore, the information was not likely to affect a reasonable juror's assessment of any critical issue in the case. *Id.* at 17–18 ("Finally, the extra-record information was relevant only to Rodrick's identification of Bibbins .... [which was not] essential to the government's case.... The strength of the State's case against Bibbins thus precluded the possibility that the extra-record information provided by Ms. Krainak would have a substantial and injurious effect on the verdict of a reasonable jury.").

■ *McMann* and *Bibbins* instruct that jurors may permissibly share their knowledge and experiences regarding the community in general and the reputations of institutions, entities, or members of the community. *See also Bulger*, 575 F.2d at

412 ("It would be naive to suggest that individual jurors leave all their preconceptions, values and insights on the doorstep when they enter the jury room. Indeed, we encourage jurors to bring their experiences to bear during deliberation. The line between this permissible activity and the consideration of improper evidence is seldom clear. Yet, where specific facts enter the crucible of decision without appropriate safeguards, the constitutional role of the jury is undermined ....").

■ Any statements made by Juror Number 9 regarding the relative quality of New York City hotels were not improper. Such information concerns the general reputations of well-known public places in New York City. Plaintiffs could not have expected that no jurors had heard of these hotels or were aware of their relative degrees of prestige. The fact that Juror Number 9 was a "corporate travel consultant" does not change the nature of the information imparted.[3] Jurors are entitled to bring their own general experiences to bear. *Bulger*, 575 F.2d at 412. It may certainly be true, as plaintiff contends, that most New Yorkers and presumably most members of the jury are not wealthy enough to frequent establishments such as the Pierre Hotel. But particular information need not be known by all or even most members of the jury for it to be acceptable

---

**3.** The phrase "corporate travel consultant" was first introduced in the affidavit of plaintiff's counsel at ¶ 5. The record does not reveal how Juror Number 9 described her occupation, because, following the practice in civil trials, jury selection was not transcribed. In any event, plaintiffs did not seem to be concerned during *voir dire* that Juror Number 9's professional experiences would make her an "expert" in the eyes of other jurors. At that time, counsel for plaintiffs had the opportunity to request inquiry into Juror Number 9's familiarity with the hotel industry in general and the Pierre Hotel in particular, but they made no such request. *See Shakur*, 723

F.Supp. at 933–35 ("[C]ounsel are also under a duty to see that potentially prejudicial influences are fully explored during the voir dire examination of prospective jurors.").

Both plaintiff and defendant cite New York state cases regarding jurors with expert knowledge. *People v. Maragh*, 94 N.Y.2d 569, 708 N.Y.S.2d 44, 729 N.E.2d 701 (2000); *23 Jones Street Assoc. v. Beretta*, 182 Misc.2d 177, 699 N.Y.S.2d 250 (1999), *aff'd*, 280 A.D.2d 372, 722 N.Y.S.2d 229 (2001). These cases do not deal with standards for granting new trials in federal court and are not binding upon this Court.

as part of their combined common knowledge about their community. As the court in *Bibbins* stated, "the life of this community is part of the fund of ordinary experience that jurors may bring to the jury room and may rely upon, in the same way that [a] juror may know that Times Square is busy all night or that there are doormen along stretches of Park Avenue." 21 F.3d at 17; *see also Datskow v. Teledyne Continental Motors Aircraft Prod.*, 826 F.Supp. 677, 689 (W.D.N.Y.1993) (finding that information about verdict in unrelated case was just "one more component of the jurors' body of common knowledge and experience which they brought to the deliberations, but ... it was not prejudicial information 'improperly brought to bear' upon the jury").

■ Even if it were improper for Juror Number 9 to convey her impressions of the relative qualities of New York hotels to the other jurors, and I hold that it was not, that information was nonprejudicial for the reason that it was cumulative of trial testimony and did not bear on any disputed issues of fact. *See Bibbins*, 21 F.3d at 17 (holding that information was not prejudicial, because it was cumulative and not relevant to any critical issue); *see also United States v. Simmons*, 923 F.2d 934, 944 (2d Cir.1991) (holding that admission of disputed testimony was harmless because it was cumulative of other testimo-

ny); *United States v. Calbas*, 821 F.2d 887, 894–96 (2d Cir.1987) (finding that information related to defendant's home address was not prejudicial, because it bore no relevance to count on which defendant was convicted); *Bulger*, 575 F.2d at 411 (finding that information about defendant's home address was prejudicial, because it tended to discredit defendant's excuse for being near scene of crime); *Shakur*, 723 F.Supp. at 936–44 (conducting extensive review of caselaw on prejudice and finding that juror's familiarity with defense witness was not prejudicial).

A perusal of the trial transcript readily demonstrates that the statement by Juror Number 9 was cumulative of undisputed evidence. There was testimony by witnesses both for defendant and for plaintiffs that the Pierre Hotel was of a higher quality than other NYC hotels. Plaintiffs did not attempt to prove otherwise. On the contrary, plaintiff Cocconi identified the Pierre's superior qualities as the reason why she wanted to work there.[4] The assistant director of human resources at the Pierre Hotel, Laura O'Neill, who interviewed plaintiffs, described the commitment to high-quality service at the Pierre.[5] She said that the service standards at the Pierre Hotel were higher than those at other hotels and stated that the Pierre was the only hotel in New York to receive a certain award for service.[6] She also ex-

4. *See* infra note 8.

5. "All of [the Four Seasons] hotels are very much of exceptional quality. The service standards are extremely high.... The focus, the emphasis is really on directly training the line employees who deliver the service to the guest." Testimony of Laura O'Neill at 6. "The main aspect in banquets, particularly at the Pierre, it is very service-oriented business. When a guest attends a banquet injunction [sic], the server that is directly interacting with them and serving them will really determine what their opinion is of the banquet

function, more so than any other employee they interact with. So the criteria, the personality and the warmth and friendliness of the candidates were very critical to the criteria of what we were looking for." *Id.* at 16.

6. "[T]here is a lot more expected at the Pierre, our standards are much higher than other hotels." *Id.* at 200. "Q: Has the Four Seasons received any awards for its service? A: We have. In *Travel and Leisure* we are one of the top hotels for service, awarded for service. In *Conde–Nast* magazine we are in the top 10 hotels in U.S. cities, and in fact we

plained how she evaluated the quality of service at other hotels and establishments where job applicants had worked.[7] Plaintiffs themselves acknowledged the high quality of service at the Pierre and never stated that other hotels or establishments were of the same or higher quality.[8] Nor did counsel for plaintiffs attempt in her closing argument to challenge character-

izations of the Pierre Hotel as being of the highest quality; if anything, counsel contributed to that characterization.[9]

Plaintiff argues that O'Neill admitted that the service at the Pierre was similar to that at other hotels; but plaintiff takes O'Neill's statement out of context. O'Neill was referring to the structure of the hotel business, not the quality of service.[10]

---

are the only hotel in New York City to receive that award." *Id.* at 9.

7. "The Algonquin Hotel and the Roosevelt Hotel were the two hotels [Ms. Cocconi] had previously worked at, which in my opinion I don't feel the service standard is the same as the Pierre. Her job at the Hilton Hotel Ms. Cocconi I believe had just gotten the same month that she was being interviewed with me. So I didn't apply the Hilton necessarily to her work history." *Id.* at 29. "[Mr. Rab's] work history and service standards were very high. He had worked at the Waldorf, Water's Edge, and Tavern On The Green for his á [sic] la carte restaurants. At the Waldorf, he also worked banquet. He gave me a lot of specific service examples where he really did go out of his way. He understood how his interaction with the guests and his personality impact the level of service, which is in line with the Pierre." *Id.* at 79. "[Mr. Aman's] service standards again was high. He was a banquet waiter at the Ringha Royal Hotel. . . . [H]e described a wedding as a performance that the servers are actually part of and it is an experience. That is very much in line with what we do at the Pierre." *Id.* at 80.

8. Cocconi stated at trial, "[Ms. O'Neill] asked me why I wanted to apply for the Pierre, I said because it's one of the best hotels. . . . I always tried to improve myself." Testimony of Nancy Cocconi at 46.

Trujillo likewise stated, "I tell [Ms. O'Neill] this is the best place in the world to work in the city. Pierre was the number one hotel at that time." Testimony of Gloria Trujillo at 30.

Roberts acknowledged that the Pierre was a prestigious hotel:
Q: Was [the fact that you did not initially receive an interview] an indication to you that it was a very desirable job at the Pierre and many people applied?

A: Yes.
Testimony of Roberts at 35. Roberts also mentioned that quality of service varied in different establishments:
Q: What was the difference between the work that you were doing at the catering halls and the work that you would later do at the hotel banquet halls?
A: Not a lot of difference. The payment is higher in the hotels, and the service might be a little more ornate, complicated.
*Id.* at 22–23.

There was one moment during the trial when a plaintiff may have implied that a hotel where she had worked was of the same caliber as the Pierre Hotel. Green stated that the Drake Hotel, where she had worked on roll call only a few times, was "one of the top five hotels in the country," but she made no explicit comparison to the Pierre Hotel. Testimony of Susan Green at 23.

9. "The Pierre Hotel is a very fancy hotel. . . . Let's say we go by chauffeured car limousine, because after all it is the Pierre and it is our imagination. . . . We pull up to the curb, and a doorman hurries out to escort us into the hotel, because that is the kind of service they provide at the Pierre. There's no question about that. We are not disputing that the Pierre Hotel is a fine establishment." Summation by Hope Pordy at 2–3. "Some of the best paying jobs in the hotel industry [are at the Pierre], no doubt about that." *Id.* at 5.

10. "Well, the structure of a hotel is completely similar to the Pierre. When you are working in a hotel, the hotel has many departments and divisions. So if you are working in the banquet department, you are part of that division, but you are also part of something much larger, which is the hotel . . . . Whereas, a club, you are simply working for the club." Testimony of Laura O'Neill at 39.

Plaintiff also argues that the statements by Juror Number 9 conflicted with testimony by plaintiffs that other hotels where they had worked were comparable to the Pierre Hotel. The testimony cited by plaintiff deals with type of service, not quality of service. Some hotels employ French service at their banquets, and others employ "à la Russe," or pre-plated, service. In French service, pairs of waiters bring platters of food to the tables and serve the food onto plates while the guests are seated.[11] In "à la Russe" service, waiters bring individually covered plates to the tables.[12] The Pierre employs French service.[13] In describing their work experience, plaintiffs stated whether the hotels and other establishments where they had worked employed French or "à la Russe" Service.[14] This testimony by plaintiffs did not even touch on the relative quality of service at the hotels. The statements made by Juror Number 9 do not contradict plaintiffs' testimony. Plaintiffs never testified that the quality of service at other hotels, or other establishments, was comparable to the quality of service at the Pierre; if anything, they indicated just the opposite.

Plaintiff contends that the statements made by Juror Number 9 regarding the relative quality of hotels where plaintiff had worked and the Pierre Hotel were directly relevant to plaintiff's qualifications, a critical issue in the case. It may be true that plaintiff's qualifications, or more precisely the credibility of O'Neill's assessment of those qualifications, was a central issue at trial. Plaintiff never attempted to prove, however, that the hotels where plaintiff had worked provided the same quality of service as the Pierre Hotel, and plaintiff never endeavored to challenge testimony characterizing the Pierre Hotel as superior to other New York hotels in the service department. Therefore, statements by Juror Number 9 regarding the quality of New York hotels did not bear on a contested issue.

**11.** Testimony of Marilyn Roberts at 7 ("In French service people work with a partner.... One partner serves the meat or fish and the other partner serves the vegetable.... You work with a spoon and a fork, and you approach each person individually so that the person has to sort of move to the side so they don't get things spilled on them.").

**12.** Id. at 9 ("A la Russe means you are carrying not just one small tray, but you are carrying a large tray loaded with a plate, which then has a cover on it, and inside the plate is the meat or fish and the vegetables. So they get placed ... in its entirety on the plate before the client.").

**13.** Testimony of Susan Green at 19.

**14.** The statements made by Cocconi are representative of all the plaintiffs' testimony in this respect:
Q: What kind of service did they use at the Parsippany Hilton Hotel?
A: Preplated
Testimony of Nancy Cocconi at 6.
Q: What type of service did they use at the Vista?
A: French service.
Id. at 7.
Q: Did you perform French service at the Westbury Hotel?
A: Yes, I did.
Id. at 8.
Q: Did they use preplated service at the Roosevelt?
A: No. Occasionally certain parties. But usually French service.
Id. at 11–12.
Q: Was there anything different about the type of service they used at the Pierre from your experiences at the Roosevelt or other hotels?
A: The service is the same. All hotels, it doesn't matter what kind of hotel it is, the service is the same.
Id. at 14.
Q: What type of service did they use at the New York Hilton ...?
A: French service.
Id. at 21.

Extraneous information is nonprejudicial if it is cumulative of properly admitted evidence or if it has no significant relevance to any critical issue. *See Bibbins,* 21 F.3d at 17; *Simmons,* 923 F.2d at 944. Any statements made by Juror Number 9 regarding the quality of the Pierre Hotel in comparison to other New York hotels were cumulative of testimony at trial, did not bear on any issue in controversy, and therefore were not prejudicial.

### CONCLUSION

Because the extraneous information imparted to the jury was not improper, and in any event was cumulative and not prejudicial, I deny plaintiff's motion for a new trial.

It is SO ORDERED.