**Ellicia STOWE, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION ("AMTRAK"), Defendant.**

**No. 08–CV–4767 (RER).**

United States District Court, E.D. New York.

June 23, 2011.

Elizabeth Blair Starkey, Paul T. Hofmann, Hofmann & Schweitzer, New York, NY, Paul G. Moody, Willard J. Moody, Moody Law Firm, Portsmouth, VA, Rafael Vergara, Roseberg Musso & Weiner LLP, Brooklyn, NY, for Plaintiff.

Mark Seth Landman, Elizabeth Gannett Land, Landman Corsi Ballaine & Ford P.C., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

RAMON E. REYES, JR., United States Magistrate Judge.

Ellicia Stowe ("Stowe" or "plaintiff") seeks damages from National Railroad Passenger Corporation ("Amtrak" or "defendant") under the Federal Employers Liability Act ("FELA") for personal injuries she sustained during the performance of her duties as an Amtrak employee. I presided over the five-day jury trial that began on October 25, 2010. At the end of trial, the jury returned a verdict for defendant finding that Amtrak's negligence, which was admitted, did not cause any of Stowe's alleged injuries. Plaintiff has since moved for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.

For the reasons that follow, plaintiff's motion is denied.

## BACKGROUND

Amtrak employed Stowe beginning in February 1998. Since that time, she has worked for Amtrak in various positions.

At the time of the incident in question, Stowe worked as lead cash clerk at Amtrak's Penn Station Ticket Office. As part of her duties, Stowe managed money for the ticket agents, which required her to utilize a large safe located in her office. During Stowe's shift on August 14, 2006, the safe door became unhinged, fell, and allegedly struck her. Stowe claims that the incident caused physical injuries to her back, chest/breast, shoulder, and neck, and mental/emotional injuries including post-traumatic stress disorder ("PTSD") and fear of cancer. Prior to trial, Amtrak conceded that it failed to properly maintain the safe door. Having admitted negligence, the only issues remaining for the jury were whether the incident caused Stowe's alleged injuries, and the amount of damages as a result.

At trial, the jury heard testimony about the day of the incident from Stowe, her mother Monica Medina, co-worker Robert Ermer, Amtrak Police Officer Paul Pisano, and Amtrak labor representative John Michael (Charles) Jackson. Stowe, Medina, and friend and co-worker Shelley Ann Martin also testified as to Stowe's present-day condition, and what effects the incident had on her daily living. Cathy Ryan, an Amtrak manager, testified as to Stowe's recent work history, internal Amtrak documents about the incident, and Stowe's medical leave. The jury also heard medical testimony from experts Dr. Leonard Bleicher, Dr. Arthur Wardell, and Dr. Edward Crane, treating physician Dr. Lauren Stimler–Levy and treating psychologist Nancy Julius, Ph.D.[1] The jury also watched the security video from the day of the incident and surveillance video taken of Stowe starting one week after the incident through December 2009. On October 29, 2010 after hearing all the evidence, the jury delivered a verdict for Amtrak, finding that Amtrak's negligence did not cause any of Stowe's alleged injuries.

Stowe argues that she is entitled to a new trial because: (1) the verdict was against the weight of the evidence; (2) the verdict was against the weight of the law; (3) the Court erred in instructing the jury on causation; (4) the Court erred in granting Amtrak's motion for judgment as a matter of law with respect to Stowe's fear of cancer claim; (5) the Court erred in admitting evidence of Stowe's sexual history; (6) the Court demonstrated antipathy toward Stowe's case; and (7) the verdict is defective as a matter of law due to juror misconduct.

## DISCUSSION

### I. Standards for Granting a New Trial

 A trial court may order a new trial "for any reason for which a new trial has [previously] been granted in an action at law in federal court." FED.R.CIV.P. 59(a)(1)(A). However, a motion for a new trial under Rule 59 ordinarily "should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir.2002). As such, a new trial is warranted if the trial court finds that the verdict was against the weight of the evidence or law, *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir.1998), or finds that "errors [were] likely to have had a substantial effect on the jury's resolution of the factual disputes at

---

1. Neither Dr. Wardell, nor Dr. Stimler–Levy testified live at the trial. Dr. Wardell's deposition testimony was read into the record. Dr. Stimler–Levy's videotaped deposition was played for the jury. The jury was instructed to regard their testimony the same as if it had been given on the stand like the other physicians and witnesses.

trial," *Nimely v. City of New York,* 414 F.3d 381, 392 (2d Cir.2005).

## II. Jury Verdict was Not Against the Weight of Evidence or Law

### A. Amtrak's Opening Statements Did Not Constitute a Binding Admission

Plaintiff argues that as a matter of law, she was entitled to some damages since defense counsel admitted that she injured her left shoulder and chest as a result of the incident. (Plaintiff's Memorandum of Law in Support of Motion of Plaintiff Ellicia Stowe for Post–Trial Relief ("Pl. Mem."), dated Nov. 26, 2010, at 4.) In his opening statement, defense counsel made the following statements that could arguably be construed as admissions against Amtrak:

- "Amtrak admits they were negligent. Amtrak admits that Ms. Stowe was injured. Amtrak admits she is entitled to fair and reasonable compensation. We are not contesting any of that." (Tr. at 19.)[2]
- "But what happened to Ms. Stowe? And I'll tell you exactly. She injured her left shoulder. It hit her and you will see it in the video exactly how it plays out[ ]. You can't really see if it hits or not but we are not contesting

that it didn't hit her." (*Id.* at 19–20.)[3]

■■■ It is true that an attorney's statements during opening and closing arguments may constitute admissions of his client; however, to bind the client by such statements, they must constitute "a clear and unambiguous admission of fact." *United States v. McKeon,* 738 F.2d 26, 30 (2d Cir.1984) (citing *Oscanyan v. Arms Co.,* 103 U.S. 261, 263, 26 L.Ed. 539 (1880)); *see also Butynski v. Springfield Terminal Ry. Co.,* 592 F.3d 272, 277 (1st Cir.2010) (explaining that to qualify as a binding admission, counsel's opening "statement, when viewed in context, must be clear and unambiguous"); *Robinson v. McNeil Consumer Healthcare,* 615 F.3d 861, 872 (7th Cir.2010) (quoting *MacDonald v. General Motors Corp.,* 110 F.3d 337, 340 (6th Cir.1997) ("[I]n order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous.")). All inferences must be made in favor of the party against whose interests the admission was allegedly made, particularly considering that "opening statement[s] of counsel [are] ordinarily intended to do no more than to inform the jury in a general way of the nature of the action and defense so that they may better be prepared to understand the evidence."

**2.** "Tr." references the trial transcript and record. Additionally, the trial transcript, at times, spells Amtrak as "Amtrack." Those instances have been changed herein, though the alterations are not reflected in the quotations.

**3.** In her reply, plaintiff also argues that defendant's counsel conceded plaintiff's injury during the hearing on defendant's motion to dismiss the fear of cancer claim. (Reply Memorandum of Law in Support of Plaintiff's Motion for Post–Trial Relief ("Pl. Reply"), dated Dec. 29, 2010, at 2.) Fear of cancer FELA claimants fall into two categories— those who merely *allege* exposure to a carcin-

ogen and those who *allege* a physical injury (or disease) causing the fear of cancer. *See Norfolk & W. Ry. Co. v. Ayers,* 538 U.S. 135, 146–47, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003). When pressed at the hearing as to which category plaintiff's claim fell under, defendant stated "[s]he has a physical injury." (Tr. at 277.) Contrary to plaintiff's argument, which ignores the context of the statement, counsel was merely conceding for the sake of his motion that Stowe's fear of cancer claim fell into the latter category— that is, a FELA claimant who *alleges* a cognizable physical injury. It is disingenuous and misleading to characterize this statement as a "candid admission."

*Best v. District of Columbia*, 291 U.S. 411, 415, 54 S.Ct. 487, 78 L.Ed. 882 (1934).

■ Contrary to Stowe's contention, counsel's statement that she "is entitled to fair and reasonable compensation" did not unequivocally mean that she was entitled to some compensation. Rather, counsel acknowledged that a plaintiff who is injured as the result of negligence is generally entitled to compensation for such injuries. The statement intimated to the jury that Amtrak's theory of the case was not if any compensation was appropriate, but rather how much. However, the statement does not constitute a clear and unambiguous admission that would take the issue of whether she was entitled to anything out of the jury's consideration.

■ The most troubling statements, and the only ones upon which Amtrak's counsel could have bound its client to a finding for Stowe, were "Amtrak admits that Ms. Stowe was injured" and "[s]he injured her left shoulder." (Tr. at 19.) Yet, Amtrak's counsel during summation directly addressed the statement, and recanted:

> And the first question you're going to have to decide when you go back to talk is did she have any injury? Now, I told you you know right up front we don't contest that. Well, my eyes have been opened a little bit by this trial but that's your call whether or not she had got injured.

(*Id.* at 1022–23.) Moreover, throughout the trial, Amtrak consistently challenged not only the extent of Stowe's injuries, but whether she sustained any compensable injury at all. Viewing the identified statements about Stowe's injured left shoulder in isolation, Amtrak seemingly conceded that, at the very least, she had a compensable shoulder injury; however, in the context of the opening, wherein counsel qualified his statements as what he thought the evidence would show, and that he was pointing out "landmarks to look for," (*id.*

at 19), his statements were not so clear and unambiguous as to qualify as a binding admission by Amtrak that Stowe injured her left shoulder.

In fact, during plaintiff's opening statement to the jury, her counsel said: "The railroad is saying that she never got hurt." (*Id.* at 12.) Equally telling, plaintiff never moved for judgment as a matter of law that she sustained shoulder injuries based on Amtrak's alleged admission. She did not object to Amtrak's statement during summation that the jury had to decide whether she was injured at all. Nor did she object to the inclusion of "shoulder injuries" as part of the causation question on the verdict sheet. And so, it seems that Stowe did not reasonably perceive Amtrak's opening statement as a binding admission during trial. Drawing all inferences in Amtrak's favor, counsel's opening statements did not constitute a binding admission that Stowe suffered a compensable shoulder injury, and therefore, the question of whether Stowe suffered any injury at all remained one for the jury to decide.

**B.** *Jury's Verdict was Not Against the Weight of the Evidence*

■ Plaintiff also argues that the verdict was against the weight of the evidence. (Pl. Mem. at 4–10.) The trial court may grant a motion for a new trial on grounds that the verdict was against the weight of the evidence even if there is substantial evidence to support the jury verdict. *DLC Mgmt.*, 163 F.3d at 134. The judge is also free to weigh the evidence independently, rather than in the light most favorable to the prevailing party. *Id.* Although free to weigh the evidence independently, the "court should rarely disturb a jury's evaluation of a witness's credibility." *Id.* Accordingly, "[w]here the resolution of the issues depended on assessment of the credibility of

the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992), *abrogated on other grounds by Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Additionally, upon independently weighing the evidence, the court should only grant a new trial if "the 'weight' ... [is] so great as to allow the court to conclude that there has been a 'seriously erroneous result,' or 'a miscarriage of justice.'" *Depascale v. Sylvania Elec. Products, Inc.*, 710 F.Supp.2d 275, 285 (E.D.N.Y.2010) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir.2002)).

█ I recognize that the jury heard evidence from which it could properly have found that Stowe sustained at least some of her claimed injuries as a result of the safe door incident, but the jury also heard substantial evidence to support its verdict.[4] Upon independent review and giving due consideration to the jury's credibility determinations, I cannot find that the jury verdict was seriously erroneous or a miscarriage of justice.

An Amtrak security camera in Stowe's office captured the incident and next 28 minutes or so. (Tr. Def. Exh. T, Camera 14, 12:08–12:39.) It is not clear from the video that the door actually struck Stowe (nor is it clear that it did not), but the video does show Stowe 10 minutes after the door fell walking around her office, bending down, and reaching into the safe. All the while, she does not have a look of pain or discomfort on her face. Additionally, Stowe testified about how the door struck her, where it hit her, and the pain that immediately resulted—equating the pain to that of contractions during childbirth. (Tr. at 547, 781–82.) Her testimony was contradicted by the version of events in the video. Not only did she not appear to be experiencing contraction-like pain, but her description of the incident was not consistent with how the events unfolded on camera. Undoubtedly, this affected the jury's assessment of her credibility. Indeed, from the video alone one could infer that the safe door did not actually strike Stowe at all.

Moreover, the jury heard from competing medical experts—Dr. Crane, defendant's expert orthopedic surgeon, and Dr. Bleicher, Stowe's expert physiatrist—and the jurors were equally entitled to accept or reject their opinions as to the injuries Stowe sustained and their cause. *See In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 739 F.Supp.2d 576, 604 (S.D.N.Y.2010) (A jury is "free to accept or reject the expert's opinions in whole or in part and to draw its own conclusions" from the testimony.) Dr. Crane testified that upon review of the records and his independent medical examination of Stowe, there were no objective findings of residual injury to the chest, neck, or lower back. (Tr. at 598.) He also opined that the causal connection between the incident and Stowe's alleged shoulder injury was "very questionable." (*Id.* at 601.) He noted that a preoperative MRI indicated that her shoulder was normal. (*Id.* at 599.) He also indicated that the only possible objective finding of a shoulder injury in her surgical records was a "frayed labrum," which he explained is "commonly seen absent any trauma ... as part of the normal aging process even in a young person. It's very commonly seen in

---

4. Stowe outlines all of the evidence that she believes support her claimed injuries. Although I have carefully considered all evidence from trial in ruling on this motion, I will not endeavor here to exhaustively list all evidence in favor of or against her claims. Rather, I will only highlight the evidence that most directly impacts whether or not the safe door struck her, and whether or not she sustained any injury at all.

people who have been involved athletically, who played a sport like basketball." (*Id.* at 600.) Most notably, he opined that you would expect to see "some local sign" of this kind of trauma in the form of bruising, abrasion, or discoloration. (*Id.* at 608.) Yet, he noted, nothing in the medical records indicated bruising or hematoma, (*id.* at 609)—a statement corroborated by Stowe herself, who admitted that she never had any bruising on her chest or shoulder following the incident, (*id.* at 816).

Dr. Bleicher, by contrast, testified that she had chest, neck, lower back, and shoulder injuries all of which he opined were caused by the incident. Indeed, despite the fact that nothing in the medical records indicated bruising or discoloration and that Stowe said she never had bruising following the incident, he testified that she had a hematoma, bruising, and swelling on her left breast caused by the incident. (*Id.* at 254.)[5]

When presented with conflicting medical opinions as to a person's injuries and causation, it is within the province of the jury to assess credibility and resolve the conflict. Here, it is obvious from the jury's verdict that it chose to credit Amtrak's medical expert over Stowe's, and in addition to the video, it is obvious that the determination of whether she was physi-

cally injured at all turned largely on the credibility of both Stowe herself and the experts.

Similarly, Stowe's credibility and that of her psychologist's opinion regarding Stowe's depression and PTSD diagnosis played a crucial role in the jury's determination that she sustained no mental or emotional injuries. Dr. Julius testified that Stowe met the criteria for PTSD, categorizing the safe door incident as a "life-threatening horror." (*Id.* at 454.) Yet the jury was instructed that they could disregard her opinion entirely if they found that the reasons given in support of her opinion were not sound, were contradicted by other evidence, or were contrary to common sense. (*Id.* at 1057).

The jury heard that the Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV TR") lists a set of illustrative events that trigger PTSD (and qualify as "life-threatening horrors") including "military combat, violent personal assault, sexual assault, physical attack, robbery, mugging, being kidnapped, being taken hostage, terrorist attack, torture, incarceration as a prisoner of war, or in a concentration camp[,] [n]atural or man made disasters, severe automobile accidents or being diagnosed with a life threatening illness." (*Id.* at 453–54.) Although not

---

5. The jury also heard medical testimony from treating physician Dr. Stimler–Levy and plaintiff's expert Dr. Wardell. As noted by Amtrak in its brief, Dr. Stimler–Levy opined that Stowe was more disabled than a person who has lost a limb. (Transcript of Lauren Stimler–Levy Videotaped Deposition, dated Oct. 21, 2010, at 202–205.) Observations of Stowe in the courtroom and on the surveillance videos contradicted such testimony, and the jury could properly have chosen to discredit Dr. Stimler–Levy's testimony on this basis. Also as noted by Amtrak, Dr. Wardell's testimony revealed inconsistencies between his finding that Stowe had five percent permanent impairment in her left shoulder and his findings that Stowe had full range of mo-

tion in her shoulder and no indication that she used her left arm less than her right in completing most daily activities. (Tr. at 728, 741.) Dr. Wardell's finding that Stowe had a sprained neck was inconsistent with the lack of objective symptoms he found during his examination, as well as the lack of documented pain, stiffness or limited range of motion in Stowe's neck immediately following the incident. (*Id.* at 731–33, 735.) Finally, he also testified that he found no objective signs of a costochondral (or left chest) injury as well. (*Id.* at 729–30.) Even setting aside these obvious discrepancies, the jury was entitled to credit Dr. Crane's testimony over plaintiff's medical experts and treating physician.

an exhaustive list of life-threatening horrors, the safe door incident, as viewed on camera, pales in comparison to the examples of events listed in the DSM–IV TR that trigger PTSD.

Furthermore, Dr. Julius's diagnosis and opinion rested entirely upon her belief of Stowe's subjective statements of her symptoms and pain. (*See id.* at 436–37 (describing Stowe's symptoms all in terms of what Stowe told her); *id.* at 448 ("I believe everything she told me about her pain . . . . I generally believe my patients."); *id.* at 486 ("My job is to believe the patient.").)[6] Yet, the jury heard more than enough information to conclude that any opinion based on such statements was flawed. Most notably, Dr. Julius testified that she believed Stowe had an "anniversary reaction," explaining that every year around the time of the incident Stowe has a resurgence of symptoms and becomes very afraid. (*Id.* at 437–38.) The jury, however, heard that Stowe went to work on the anniversary of the incident—and that this was in fact an unscheduled day of work that she *voluntarily* picked up. (*Id.* at 197.)[7] Another example is that Dr. Julius testified that she believed Stowe had recurring nightmares about the incident. Yet, the jury heard first hand Stowe's description of her alleged nightmares about the safe door: "Say, for instance, *Nightmare on Elm Street,* he's coming after you, Freddy Krueger, and he's coming after you. That's what I feel. . . ." (*Id.*

at 820–21.) As with the rest of Stowe's testimony as to her subjective pain—physical and emotional, the jury was entitled to discredit statements about her alleged nightmares if they disbelieved her testimony.

Finally, although Dr. Julius was accepted as a treating physician, she did not see Stowe for the first time until August 2010 only two months prior to trial. (*Id.* at 443.) Moreover, Stowe never previously sought treatment from any mental health practitioner. (*Id.* at 814–15.) The jury heard all of this, and also that Stowe was in fact referred to Dr. Julius not by a doctor, but by her attorneys, (*id.* at 419)—providing more evidence to doubt the sincerity of Stowe's statements upon which Dr. Julius relied, and of the psychic pain Stowe claimed. Recognizing that Dr. Julius's diagnosis was based entirely upon Stowe's self-serving statements, and hearing those statements for themselves, the jury could properly, and clearly did, disregard her opinion as to Stowe's depression and PTSD.

Given the credibility assessments that the jury clearly made, I cannot find that the jury verdict was seriously erroneous or a miscarriage of justice. As such, the motion for a new trial on grounds that the verdict was against the weight of the evidence must be denied.

---

**6.** I note that Dr. Julius's testimony was very genuine; however, the jury also heard her say that if she "mess[ed] up" the testimony, she "may not" charge the law firm. (Tr. at 464.) Such statements, though innocently made, may have also led the jury to question Dr. Julius's credibility and interest in delivering a certain result to Stowe.

**7.** When defense counsel asked Stowe to tell the jury how she felt on her 2010 anniversary date, Stowe responded: "This year I did work on my anniversary. That's what you're get-

ting at and . . . I'll answer your question." (Tr. at 851.) She also noted that she did not work in the ticket office that day. She did not, however, answer the question asked, which was how she felt on her anniversary date. Instead, she anticipated and answered questions that were not yet asked. As a result, it also came out that she sat in on the entire testimony of Cathy Ryan, and no other witness. Stowe's defensiveness and decision to sit in only on Ryan's testimony also gave the jury reason to discredit Stowe, and it seems clear that they did.

## III. *Causation Instruction was Proper*

 Next, plaintiff argues that the causation instruction was erroneous and warrants a new trial. (Pl. Mem. at 12.) The court should order a new trial if the jury instructions were erroneous, and such error may have influenced the jury's verdict. *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000). If, however, a court is convinced that the error was harmless—that is, that it did not influence the verdict—no new trial is warranted. *Id.* Jury instructions are not erroneous if "taken as a whole and viewed in light of the evidence, [the charge] show[s] no tendency to confuse or mislead the jury as to principles of law which are applicable." *Hathaway v. Coughlin*, 99 F.3d 550, 552–53 (2d Cir.1996). "[T]he particular words used in a jury instruction may (depending on the circumstances) be less important than the meaning or substance of the charge as a whole." *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 n. 1 (2d Cir.1998). In the instant case, no new trial is warranted because the causation instruction was not erroneous.

I charged the jury with the statutory language regarding the FELA causation standard, rather than the exact pattern instruction offered in Modern Federal Jury Instructions. The charge on causation was:

> A few words on causation.
>
> For purposes of this action, damage or injury is said to be caused by a defendant's negligence whenever it appears from the evidence that the plaintiff's injury resulted *in whole or in part* from the negligence of the railroad or its employees or agents. In other words, did such negligence play *any part* in bringing about an injury to the plaintiff? So

if you should find by a preponderance of the evidence that Amtrak's negligence contributed *in whole or in part* to any injury or damage suffered by plaintiff, Ellicia Stowe, you must find that the injury or damage was caused by defendant Amtrak's failure to use reasonable [care]. It is important to remember that there can be more than one cause of an injury. The involvement of any other cause does not prevent a finding for the plaintiff, as long as you fin[d] the employer's negligence played *any part* in causing an injury to the plaintiff. . . .

(Tr. at 1062–63 (emphasis added).) Plaintiff contends that these instructions "failed to adequately advise the jury of the FELA standard of causation." (Pl. Mem. at 12.) Plaintiff argues that the instruction was erroneous by omitting the phrases "even the slightest" and "no matter how small," which she had requested. (Pl. Mem. at 12–13.) Plaintiff further contends that use of the phrase "the cause" immediately prior to giving the causation instruction and later use of the phrase "the result" "compounded" the error by "re-injecting the concept of proximate causation into the instruction."[8] (Pl. Mem. at 13–14.) Defendant asserts that the omission of these phrases does not impute an improper proximate causation standard, nor does the stray use of *"the* cause" or *"the* result" inject the idea of proximate cause into the jury instructions. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a New Trial ("Def. Mem."), dated Dec. 13, 2010, at 17–23.)

> FELA provides:
>
> Every common carrier by railroad while engaging in [interstate] commerce . . . shall be liable in damages to any person suffering injury while he is employed by

---

**8.** As noted by Defendant, the portion of transcript to which Plaintiff refers actually says "a result" (Tr. at 1063), and Plaintiff has voiced no objection to the use of "*a* result" as op-

posed to *"the* result." However, the written instructions did contain the phrase "the result," and each juror was given a copy. (Tr. Court Exh. 1 at 14.)

such carrier in such commerce ... for such injury ... resulting *in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery ... or other equipment.

45 U.S.C. § 51 (emphasis added). In the oft-quoted *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the Supreme Court explained that under FELA, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest,* in producing the injury or death for which damages are sought." (emphasis added). The courts of appeals have almost uniformly interpreted *Rogers* as standing for the proposition that the FELA causation standard is relaxed from the common-law proximate cause standard. *Williams v. Long Island R.R. Co.,* 196 F.3d 402, 406 (2d Cir.1999) (citing *Rogers* and recognizing that FELA requires a relaxed standard of causation); *see also McBride v. CSX Transp., Inc.,* 598 F.3d 388, 399, 403–06 (7th Cir.2010), *cert. granted,* —— U.S. ——, 131 S.Ct. 644, 178 L.Ed.2d 475 (2010) (holding that FELA requires a "relaxed" standard of causation based on *Rogers* and collecting other cir-

cuit decisions that hold the same).[9] As such, instructing a jury on the traditional proximate cause standard of tort litigation has been found to be clear and reversible error in FELA cases. *E.g., Hausrath v. New York Cent. R.R. Co.,* 401 F.2d 634, 638 (6th Cir.1968); *Page v. St. Louis Sw. Ry. Co.,* 312 F.2d 84, 92 (5th Cir.1963); *DeLima v. Trinidad Corp.,* 302 F.2d 585, 587–88 (2d Cir.1962). *Rogers,* however, does not purport to mandate a particular jury instruction. Nevertheless, many judges and treatises have incorporated the "even the slightest" language into jury instructions. *See, e.g.,* Modern Federal Jury Instructions—Civil ¶ 89–22; 3A Fed. Jury Prac. & Instr. § 155.40 (5th ed.) (incorporating "any part, no matter how small" from *Rogers* ).

 That the charge here differed from the pattern instructions and Stowe's requested charge does not mean that it was erroneous or flawed. Pattern instructions are not a mandate for the trial court to use particular language, nor is a party entitled to the exact wording of jury instructions that they request. Rather, "a trial court has discretion in the style and wording of jury instructions so long as the instructions, taken as a whole, do not mislead the jury as to the proper legal standard...." *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 106–107 (2d

---

9. *McBride* was the first circuit opinion to address directly the question of whether a relaxed standard of causation continues to apply in FELA claims since the decision in *Norfolk Southern Railway Company v. Sorrell,* 549 U.S. 158, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007). In *Sorrell,* the majority opinion refused to address the question of the proper causation standard since it was not a ground upon which the Court granted certiorari. *Id.* at 163–64, 127 S.Ct. 799. However, in a concurring opinion, Justice Souter, joined by Justices Scalia and Alito, expressed the view that *"Rogers* left [the] law where it was"— meaning that common law proximate causation is, and always has been, the controlling

causation standard. *Id.* at 174, 127 S.Ct. 799. By contrast, Justice Ginsberg, in her concurring opinion, expressed exactly the opposite opinion, that the majority decision in *Sorrell* did nothing to the relaxed standard of causation recognized in *Rogers. Id.* at 177–78, 127 S.Ct. 799. The Supreme Court granted certiorari in *McBride* to confront the question of the FELA causation standard. *CSX Transp., Inc. v. McBride,* —— U.S. ——, 131 S.Ct. 644, 178 L.Ed.2d 475 (2010). The instant decision is made with awareness of the concurring opinion in *Sorrell* and the pending *McBride* case; however, it assumes that *Rogers* controls as interpreted by the Second Circuit and other courts of appeals.

Cir.2001) (internal citations and quotation marks omitted). The only difference (to which Plaintiff objects) between the requested and the given charge was the exclusion of the language "even the slightest" and "no matter how small."

Stowe's suggestion that omission of these phrases is per se clear error finds no support in *Rogers* or Second Circuit precedent. Of the plethora of Second Circuit cases that plaintiff cites as using the phrase "even the slightest," not a single one discussed the phrase in the context of a FELA jury charge, or so much as hinted that the language is mandatory. Plaintiff also relies on *Hausrath v. New York Central Railroad Company,* 401 F.2d at 638. As plaintiff quotes, the Sixth Circuit opinion stated that "it is reversible error for a judicial charge to fail to employ and emphasize both the 'in whole or in part' causal language of the statute and the interpretative language of the Supreme Court in the *Rogers* case." *Id.* In the same paragraph, however, the Sixth Circuit also cautioned that it did "not seek to provide mandatory language for judicial charges in FELA cases." *Id.*

Contrary to the stand-alone quote cited by plaintiff, the charge in *Hausrath* was not found to be erroneous merely because the charge omitted the *Rogers* language, but rather because the charge as a whole did not contain sufficient emphasis on the "in whole or in part" language and in fact highlighted common law proximate cause. 401 F.2d at 638. In *Hausrath*—unlike this case—the statutory language was mentioned once, but immediately explained as requiring proof of proximate cause, meaning " 'the closest cause, the direct cause, the cause but for which this would never have happened in the first place.' " *Id.* at 636, 638 (quoting the jury charge). The charges in two preceding Sixth Circuit cases, *Morrison v. New York Central Railroad Company,* 361 F.2d 319 (6th Cir.

1966), and *Tyree v. New York Central Railroad Company,* 382 F.2d 524 (6th Cir. 1967), also used the term "proximate cause;" however, the Sixth Circuit upheld both charges since greater emphasis was placed on the statutory "in whole or in part" language when taking the instructions as a whole. *Morrison,* 361 F.2d at 320–321; *Tyree,* 382 F.2d at 526–27, 528–29.

Unquestionably, the charge in the instant case was more akin to *Summers v. Missouri Pacific Railroad System,* 132 F.3d 599 (10th Cir.1997), which was also upheld. The charge in *Summers* contained no traditional proximate cause language; rather, the court charged the jury with the "in whole or in part" language of the statute. *Id.* at 606. In *Summers,* the Tenth Circuit noted that although inclusion of the *Rogers* interpretation was the "clearest articulation of the appropriate causation standard," "the use of the statutory language is not so misleading as to present a ... basis for reversal." 132 F.3d at 607. *See also, e.g., Houghton v. Port Terminal R.R. Ass'n,* 999 S.W.2d 39, 44–45 (Tex.App.1999) (upholding jury questions that used "in whole or in part" but omitted "even the slightest"); *Staley v. Iowa Interstate R.R., Ltd.,* No. Civ. 3–99–CV–80169, 2001 WL 1678769 at *2 (S.D.Iowa Aug. 15, 2001) (same). *Cf. Roberson v. Nat'l R.R. Passenger Corp.,* Civ. A. No. 86–3359, 1988 WL 26478, at *1–2, *5 (E.D.Pa. Mar. 11, 1988) (granting a new trial "out of an abundance of caution" where the jury charge contained *both* statutory and *Rogers* language *and* common-law proximate cause language, such as "but for the act or omission").

Taking the charge in this case as a whole, excluding the requested language did not call to mind a more burdensome standard of causation such that Amtrak's negligence had to be the sole cause of Stowe's injury.[10] In fact, I instructed the

---

**10.** It should be noted that the instant charge contains no reference to proximate cause or

jury directly to the contrary—stating that if Amtrak's negligence played *any part* in bringing about her injuries and if Plaintiff's injury resulted *in whole or in part* from Amtrak's negligence, they should find for Stowe. This statement of the law is clear that Amtrak need not have been the sole cause of her injuries, but could have been one of a host of factors contributing to her complained of injuries. As I reasoned at the charge conference, "in part" includes even "one percent part." (Tr. at 933.) Furthermore, I clarified that other factors may have contributed to Stowe's injuries, but that the jury should still find for Stowe so long as Amtrak's "negligence played any part in causing an injury to the plaintiff." (*Id.* at 1063.) Additionally, stray use of the phrases "the cause" and "the result" in the charge and on the special verdict sheet [11] did not contradict the clear instruction that if Amtrak's negligence played any part in bringing about any of plaintiff's injuries, then the jury was to find that Amtrak caused those injuries.

As a whole, the jury charge properly instructed the jury on the FELA causation standard. The charge clearly informed the jury that they should find Amtrak caused Stowe's injuries if Amtrak's negligence played any part in bringing about her injuries, and did not otherwise intimate that Amtrak's negligence needed to be the sole cause of her injuries. Therefore, this is not a basis upon which to grant a new trial.

## IV. *Fear of Cancer Claim was Properly Dismissed*

▮ Plaintiff also asserts that she is entitled to a new trial because I improperly granted defendant's Rule 50(a) motion and dismissed her fear of cancer claim. (Pl. Mem. at 15.) The court may grant a Rule 50(a) motion as to an issue or claim if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." FED.R.CIV.P. 50(a)(1). The court should direct a verdict under Rule 50 "when, viewing the evidence in the light most favorable to the non-moving party, 'there can be but one conclusion as to the verdict that reasonable persons could have reached.'" *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 52 (2d Cir.2003) (quoting *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 494 (2d Cir.1995)). As part of the inquiry, the court should review the whole record, but may not weigh conflicting evidence or make credibility determinations. *Reeves v. Sander-*

---

to traditional proximate cause language that has previously been found to constitute reversible error. *E.g., DeLima,* 302 F.2d at 588 (citing the traditional common law proximate cause language as "that cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of, and without which it would not have occurred"). Rather, plaintiff uses the term "proximate cause" as a synonym for "sole cause" noting Amtrak's defense of other possible causes of her alleged injuries and arguing that "the instruction may have confused the jury as to whether Amtrak's negligence had to be the sole cause of her injuries." (Pl. Mem. at 13, 14.)

**11.** Use of the phrase "the cause" on the special verdict sheet was not objected to at the charge conference, and is objected to for the first time in plaintiff's reply. Therein, she also raises an argument for the first time that somehow the special verdict sheet confused the jurors by not using the "in whole or in part" language. (Pl. Reply at 7.) This argument is untenable. As explained during the charge conference, the goal was to keep the special verdict sheet as simple as possible. (Tr. at 945–46.) Since the jurors were extensively instructed on what it meant to find that Amtrak's negligence caused Stowe's injuries, there was no need to define causation yet again on the verdict sheet. Moreover, the jurors were each given a copy of the instructions should they have needed clarification during deliberations.

*son Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

After the close of plaintiff's evidence, and before the issue was submitted to the jury, defendant moved for judgment as a matter of law on plaintiff's claim for fear of cancer damages as part of her pain and suffering award. (*See* Dkt. No. 58.) Prior to hearing the motion, I was inclined to allow the issue to reach the jury; however, I noted that I did not believe the jury would render a verdict for plaintiff based on the weak evidence presented and indicated that I was inclined to strike any such award before entering judgment in any event because there was not a proper evidentiary basis. (Tr. at 411–12.) However, upon arguing the motion, defendant expressed concern for the precedent that might be set by allowing a claim for fear of cancer predicated on blunt force trauma injuries to reach the jury. (*Id.* at 897–99.) With this concern in mind, and finding that there was no evidentiary basis to find for plaintiff on the fear of cancer claim, I granted the motion and dismissed the claim prior to the jury charge conference. (*Id.* at 901.)

**A.** *Standards for Fear of Cancer Claims*

■■■ Generally, "an employer may be held liable under FELA for risks that would be too remote to support liability under common law." *Williams v. Long Island R.R. Co.,* 196 F.3d 402, 407 (2d Cir.1999) (internal quotation omitted). However, plaintiffs seeking fear of cancer damages in FELA cases, "must satisfy a *high standard in order to obtain them.*" *CSX Transp., Inc. v. Hensley,* 556 U.S. 838, 129 S.Ct. 2139, 2141, 173 L.Ed.2d 1184 (2009) (emphasis added). In *Norfolk & Western Railway Company v. Ayers,* 538 U.S. 135, 147–48, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003), the Supreme Court recognized that FELA claimants who al-

lege a cognizable injury can seek compensation for fear of cancer as part of pain and suffering damages for that injury. The Court later explained that a claimant would have "to prove that his alleged fear [was] genuine and serious." *Id.* at 157, 123 S.Ct. 1210.

Although the parties agree that Stowe alleged a cognizable injury underlying her fear of cancer requiring that her claim be assessed under the *Ayers* standard, the parties interpret plaintiff's burden under *Ayers* very differently. Plaintiff contends that *Ayers* requires merely that a FELA claimant's fear of cancer be "genuine and serious" once she alleges an underlying physical injury, a purely subjective standard. (Pl. Mem. at 16.) On the other hand, defendant asserts that *Ayers* requires the fear to be objectively reasonable, as well as subjectively genuine and serious. (Def. Mem. at 27.) The application of *Ayers* in the instant case is admittedly murky since the predicate injury in *Ayers*—asbestosis—was indisputably linked to increased risk of cancer, whereas the predicate injury here—blunt force trauma—has a questionable (at best) link to increased risk of cancer.

In *Ayers,* the Court explained that "[p]hysically injured plaintiffs ... may recover for 'reasonable fears' of a future disease." 538 U.S. at 149, 123 S.Ct. 1210 (quoting D. Dobbs, Law of Torts 844 (2000)). Yet, the Court affirmed "only the qualification of an asbestosis sufferer to seek compensation for fear of cancer as an element of his asbestosis-related pain and suffering damages. It is incumbent upon such a complainant ... to prove that his alleged fear is genuine and serious." *Id.* at 157, 123 S.Ct. 1210. In rendering its decision, the Court explained at length the expert testimony at trial establishing an "undisputed relationship between exposure to asbestos sufficient to cause asbestosis, and asbestos-related cancer" and risks

"notably different in kind from the background risks that all individuals face." *Id.* at 154–55, 123 S.Ct. 1210 (internal quotation omitted). From the evidence, the Court concluded that "an asbestosis sufferer would have good cause for increased apprehension about his vulnerability to [cancer]." *Id.* The Court's focus on this evidence suggests that a "reasonable fear" should have some verifiable link between the underlying injury and an increased risk of developing cancer.[12]

Moreover, as a matter of policy to merit an award of pain and suffering based on fear of cancer, there must be some objective reasonableness to the fear, owing to some verifiable connection between the predicate injury and cancer. Otherwise, every FELA claimant could testify to a genuinely and seriously felt fear of cancer, and recover. As noted, however, fear of cancer claims must satisfy a higher standard, specifically to prevent " 'unlimited and unpredictable liability.' " *Ayers,* 538 U.S. at 147, 123 S.Ct. 1210 (quoting *Metro–North Commuter R.R. Co. v. Buckley,* 521 U.S. 424, 435, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997)); *see also id.* at 157, 123 S.Ct. 1210 (recognizing that only a

fraction of those exposed to asbestos will develop asbestosis thus reducing the "universe of potential claimants to numbers neither 'unlimited' nor 'unpredictable' "). A purely subjective genuine and serious standard, as plaintiff interprets *Ayers,* would result in such unlimited and unpredictable liability. Accordingly, a FELA plaintiff claiming fear of cancer, even with a cognizable injury, must be able to show that they have an objectively reasonable fear, which is both genuine and serious.

**B.** *No Cognizable Injury upon which to Base Fear of Cancer Claim*

 As an initial matter, Stowe cannot establish that she has a cognizable injury caused by Amtrak, which led to her fear of cancer. The jury found that Amtrak's negligence did not cause Stowe any of the injuries she alleged. So, even if there was sufficient evidence to submit the fear of cancer claim to the jury, this jury could not have awarded pain and suffering damages for her fear of cancer. Since I have already found that the jury's verdict must be upheld, a new trial is not warranted as there is no cognizable injury upon which Stowe's fear of cancer claim can rely.

12. *See also id.* at 149, 123 S.Ct. 1210 (giving the classic example of a fear of disease claim where a dog-bite victim could recover for fear of rabies or tetanus); *Marchica v. Long Island R.R. Co.,* 31 F.3d 1197, 1206 (2d Cir.1994) (permitting recovery for a fear of AIDS claim "if the impact caused by the defendant's negligence occurred under circumstances that would cause a reasonable person to develop a fear of AIDS"); *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1205–06 (6th Cir.1988) (noting that emotional distress damages for fear of contracting a disease are recoverable "only where such distress is either foreseeable or is a natural consequence of, or reasonably expected to flow from, the present injury" and "not recoverable where the connection between the anxiety and the existing injury is either too remote or tenuous"); *Barron v. Martin–Marietta Corp.,* 868 F.Supp. 1203, 1212 (N.D.Cal.1994) (dismissing plaintiffs'

fear of cancer claims, in part, because "plaintiffs ... produced no evidence of a verifiable causal nexus between their injuries and their developing cancer. They [did] not present[ ] any expert evidence, for example, that there is a reasonable medical possibility that injuries of the kind they have suffered give rise to cancer. Plaintiffs merely assert that they fear they will develop cancer in the future."); *Howard v. Mt. Sinai Hosp., Inc.,* 63 Wis.2d 515, 217 N.W.2d 383, 386 (1974) (Hansen, J. concurring) ("[A] present fear as to a future harm ... is not compensable whenever the future harm feared cannot reasonably be apprehended to result from the injury sustained."); *Ferrara v. Galluchio,* 5 N.Y.2d 16, 22, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958) (quoting *Milks v. McIver,* 264 N.Y. 267, 269, 190 N.E. 487 (1934)) (" 'Liability for damages caused by wrong ceases at a point dictated by public policy or common sense.' ").

### C. Insufficient Evidence of Reasonable Fear

But even so, Stowe did not establish that her alleged fear of cancer was reasonable in relation to her injuries. Stowe's medical expert opined that her risk of cancer was increased on two theories: (1) her injuries required her to undergo CT scans, which increased her exposure to radiation, which thus generally increased her risk of cancer, and (2) the incident caused microcalcifications in her left breast, which increased her risk of breast cancer. (Tr. at 266–69.)

First, although I acknowledge that plaintiff's expert opined that her exposure to radiation via CT scans and mammograms increased her risk of cancer, specifically for breast cancer, "fluid cancer, leukemia, blood cancers, [and] thyroid cancers," (*id.* at 284, 291), Plaintiff's own testimony did not establish a genuine or serious fear resulting from radiation. Stowe and her psychologist were very specific that breast cancer was the only cancer she feared, and that it resulted from seeing a "black spot" in a monitor and being told that the spot was from the "hit." (*Id.* at 436, 473, 477, 758–61.) So, even conceding generally that a link exists between radiation and cancer, Stowe's fears were not predicated on those increased risks—perceived or actual.

Second, Stowe failed to establish any connection between trauma to the chest and an increased risk of breast cancer that would lead to a reasonable fear. The only evidence offered that such a link exists came from Dr. Bleicher, Stowe's expert physiatrist. I permitted Dr. Bleicher to testify as to those opinions he formed while reviewing Stowe's medical files as a physiatrist, but he was not accepted as, nor purported to be, an oncologist or expert in the field of oncology. (*Id.* at 223–24, 236.)

Dr. Bleicher testified that the incident caused injuries to the soft tissues of Stowe's left breast and upper chest wall, based on "direct contusion which developed hematoma, bruising, swelling." (*Id.* at 254.) [13] Plaintiff published Exhibit 68–A to the jury and had Dr. Bleicher read and interpret the report. The mammography report, from May 2008, indicated that she had microcalcifications in her left breast, which were mildly suspicious for malignancy. (*Id.* at 255–56.) Dr. Bleicher claimed that microcalcifications are very suspicious "for oncological process." (*Id.* at 257–58.) He further testified that microcalcifications are deposits of calcium, which can result from a hematoma, which can be caused by direct trauma. (*Id.* at 281–82.)

Dr. Bleicher then opined that the incident resulted in direct trauma to Stowe's chest, which resulted in a hematoma, which resulted in calcium deposits in the breast, which increased her risk of breast cancer. (*Id.* at 282.) He could, however, not cite to one medical journal that supported his statement that microcalcifications (or blunt force trauma) increase the risk of breast cancer. (*Id.* at 332–33.) Moreover, he admitted that his opinion regarding Stowe's increased risk of cancer was based on "general medic[al] knowledge, information available to ... everybody ... that information is available in mass media and internet." (*Id.* at 370–71; *see also id.* at 390.) Given this admission, Dr. Bleicher was not qualified to testify as to any verifiable link between breast cancer and direct trauma. Plaintiff offered no other evidence of any connection, or of the reasonableness of her alleged fear of cancer based on blunt force trauma to the chest.

---

**13.** Although Dr. Bleicher testified that the incident resulted in bruising and hematoma, Stowe testified that she never had a bruise on her breast from this incident. (Tr. at 816.)

Even assuming Dr. Bleicher was qualified to testify about a causal connection generally, he could not—with any degree of medical certainty—quantify the increased risk a woman with microcalcifications has of developing breast cancer. (*Id.* at 291–93.) Unlike asbestosis cases, where the jurors heard expert evidence regarding the undisputed, quantified link between asbestosis and cancer (*i.e.*, 10% of people with asbestosis die of mesothelioma), *Ayers*, 538 U.S. at 154–55, 123 S.Ct. 1210, plaintiff put on no such medical evidence quantifying the link between trauma injuries and cancer. *See, e.g., Heacock v. Southland Corp.*, Civ. No. H 91–309, 1994 WL 114656, at *7 (N.D.Ind. Mar. 29, 1994) (excluding expert testimony on increased likelihood of developing cancer, even for the plaintiff's fear of cancer claim, where Plaintiff's expert could not quantify the risks).

A reasonable fear must be founded in some relationship between the underlying injury and cancer, and even if not a substantially higher risk,[14] one that would lead to a reasonable fear of cancer. *See Ayers*, 538 U.S. at 149, 123 S.Ct. 1210 ("Physically injured plaintiffs, it is now recognized, may recover for *'reasonable fears'* of a future disease.") (emphasis added). For example, a plaintiff who is bitten by a dog can have a reasonable fear of rabies or tetanus and could recover for his fear as part of his pain and suffering award; however, this same plaintiff could not recover for fear of cancer. However genuinely the fear of cancer is subjectively felt, it is not a reasonable fear resulting from a dog bite. So too here, cancer was not a reasonable fear after a blunt force trauma. Stowe did not offer competent evidence that any connection exists between her injury and cancer, or the extent of such connection.[15]

Finally, setting aside the reasonableness of her fear, the theories set forth by plaintiff—without corroborating competent medical evidence—create a serious "potential for a flood of trivial suits, the possibility of fraudulent claims that are difficult for judges and juries to detect, and the specter of unlimited and unpredictable liability." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 557, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Dr. Bleicher testified that anyone with a blunt trauma injury has an

**14.** Plaintiff asserts that I have confused her fear of cancer claim with a stand alone claim for increased risk of cancer. (Pl. Reply at 11.) This is not so. I did not dismiss her claim because she failed to prove it more likely than not that she would develop cancer. I dismissed her claim because she failed to offer any competent medical evidence of a causal nexus between blunt force trauma to the chest and (even a small) increased risk of breast cancer. Here, the expert physiatrist, who was not qualified to give expert testimony about cancer in the first place, could not cite to even one medical journal supporting his sweeping statements about the connection between blunt force trauma and cancer.

**15.** From my research, I have found one case, albeit a non-FELA case, in which a court permitted recovery for fear of breast cancer predicated on a traumatic injury to the breast. *Dempsey v. Hartley*, 94 F.Supp. 918 (E.D.Pa.1951). In this sixty-year old case, defendant argued that the court erred in permitting the testimony of plaintiff and her physician regarding the plaintiff's fear of developing cancer. There was no competent medical evidence of a connection between traumatic injury and breast cancer, but the plaintiff's physician opined that since the injury was to her breasts, the plaintiff's fear was reasonable. *Id.* at 920. I find a more recent California district court's reasoning (in another non-FELA case) more persuasive. The court there reasoned that there must be a "verifiable causal nexus" between the alleged injury and cancer to permit a fear of cancer claim to reach the jury—or risk opening the door to fear of cancer claims in every case involving serious physical injury. *Barron*, 868 F.Supp. at 1211–12. Here, there was simply no competent evidence of any link between Stowe's alleged injuries and cancer.

increased risk of cancer and that anyone who has received x-rays and CT scans also has an increased risk of cancer. Under these theories, a fear of cancer claim, then, could be stated in a significant number of (if not most) FELA cases. There is simply no limit to the number of FELA plaintiffs who would be permitted to tack on fear of cancer to their claims.

On the basis of the insufficient evidence offered, no rational jury would have had a basis to find that Stowe had a reasonable fear of cancer resulting from her alleged injuries. As such, her fear of cancer claim was properly dismissed and does not warrant a new trial.

## V. *Stowe's Sexual History was Not Improperly Admitted*

■ Stowe's next argument—that the jury heard highly prejudicial information about her sexual history and health and that this information may have biased the jury against her—fails because as plaintiff acknowledges, I offered a limiting instruction to cure any prejudicial effect of this exact information, and her counsel rejected the attempt. (Pl. Mem. at 23; Tr. at 902.) Plaintiff cannot now assert that she was prejudiced by the admission of such evidence when she expressly rejected the Court's attempt to cure any potential prejudice.

■ As defendant notes, juries are presumed to follow the instructions they are given. *Bingham v. Zolt*, 66 F.3d 553,

563 (2d Cir.1995). The offered instruction would have cured whatever minimal prejudice may have flowed from questioning that brought to light Stowe's sexual history and health.[16] *See Hensley*, 129 S.Ct. at 2141 ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions."). Stowe cannot now use her strategic decision to not have any curative instruction as a ground for a new trial.

Additionally, the evidence was not improperly admitted in the first place. Stowe contends that Amtrak's arguments leave open any woman who is claiming psychological injuries to the introduction of evidence about her sexual history. Stowe's contention, however, is flawed because Amtrak offered such evidence only as it related to her fear of cancer claims, not her claims of general emotional distress. (*See* Tr. at 901–02 (offering to strike all sexual history and health testimony after dismissal of fear of cancer claims, and defendant noting no objection to such instruction).) During the trial, I explained my reasoning for allowing cross-examination on Stowe's sexual history and health as it related to her fear of cancer claims, in addition to offering a curative instruction to cure any potential prejudice. Plaintiff's arguments in this motion do not change my mind as to the relevance of Stowe's sexual history, or to the finding that the matters were not so prejudicial as to outweigh their probative value.[17]

---

**16.** At the charge conference, I stated that "looking at these jurors and sort of based on my life experience, I don't think any of these jurors are of the type of mindset that would hold it against a woman for having unprotected *sex outside of marriage*.... But, I can't say that for sure. So, that's what the limiting instruction was designed to do." (Tr. 882.)

**17.** Questions regarding use of the "morning after pill" or any birth control were never explicitly ruled irrelevant or inadmissable.

However, this was based on defense counsel's representation that he had no intention of asking such questions. (Tr. at 412–13.) Yet a question was asked during cross-examination of Stowe that led directly to the morning after pill:

> Q: And sometimes you go there after you have unprotected sex and you ask him for certain pills; isn't that right?
> A: Certain pills?
> Q: The morning after pill?

As to the Hillcrest medical records, information was inadvertently published to the jury, albeit briefly, while defendant was questioning Dr. Bleicher regarding Stowe's mastodynia. I have reviewed them again in unredacted form, particularly those records highlighted in plaintiff's brief, and even knowing what allegedly prejudicial information they contain, I had a difficult time reading the notes and finding the offending information. (*See* Tr. Def. Exh. F.) The apparent references to chlamydia and gonorrhea are almost entirely illegible; if I were not looking for those specific words (which the jury was not as they heard no mention of them in the testimony), I would not have seen them, and certainly did not see them in the brief time the records were published to the jury during Dr. Bleicher's testimony.[18] The records also reference HPV and an abnormal pap smear—again virtually illegible. However, like questions regarding Stowe's sexual history, I permitted defendant to question Stowe and her psychologist regarding HPV as it related to her fear of cancer claim. (Tr. at 408–11, 412.) Indeed, the jury heard from Stowe that she was tested for HPV, and had received abnormal results from a pap smear. (Tr. at 817–18.)[19] So even assuming that the jury saw the reference to HPV in the records, it was not improperly admitted, nor cumulatively prejudicial.

■■ Even if any such evidence was admitted in error, this is not a ground for granting a new trial unless it affected Stowe's "substantial rights." Fed.R.Civ.P. 61. This means that the court must find that the improper evidence "was so clearly prejudicial to the outcome of the trial that [it is] convinced that the jury ... reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Nimely*, 414 F.3d at 399. Generally, "unless it is likely that in some material respect the factfinder's judgment was swayed by the error," no substantial right was affected and a new trial is not warranted. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir.1997) (internal quotation marks omitted).

The only argument Stowe makes that her substantial rights were affected is the jury verdict against her and the fact that her credibility was in issue. Here, as already discussed, the jury's verdict was not against the weight of evidence or the law. Additionally, plaintiff's argument that information regarding her sexual history and health somehow negatively affected her credibility is unavailing. Plaintiff asserts that since her credibility was at the forefront of this case, " 'even the smallest error may have been enough to tilt the balance.' " (Pl. Mem. at 23 (quoting *Nimely*, 414 F.3d at 400).) The problem with this

---

A: I don't get the morning after pill. (Tr. at 819.) However, plaintiff's counsel withdrew his request for a sidebar when defense counsel offered to move on and ask no further questions in this potentially sensitive area. (*Id.*) Moreover, the jury was instructed that answers, not questions, are evidence. Since the jury heard that Stowe did not take the morning after pill, it is unclear to me what prejudice could have resulted from the exchange.

18. Before the end of trial, reference to chlamydia and gonorrhea was redacted and the records re-submitted as part of defendant's Exhibit F.

19. The exchange between defense counsel and Stowe went as follows:

Q: Are you aware of the fact that you're at risk for getting cervical cancer?
A: HPV?
Q: Yes.
A: Yes.
Q: You're positive for that?
A: No. I have had Pap smears.
Q: But you have testified positive for HPV in the past, haven't you?
A: It tested abnormal. Not positive.

argument—and the quotation used out of context-is that in *Nimely*, the improperly admitted evidence went directly to the credibility of eyewitness testimony upon which the close case turned. 414 F.3d at 399–400. Here, evidence of Stowe's sexual history neither directly, nor indirectly, impacted upon her propensity for the truth or credibility. Much more damaging to her credibility were the conflicts the jury saw between her testimony about the incident and her pain, the security video of the incident, and the surveillance video of her after the incident. In other words, even without the allegedly damaging sexual history testimony, Stowe's credibility was already damaged beyond repair. As such, the small amount of information that was revealed about Stowe's sexual history was unlikely to have a material affect on the jury's credibility assessment. There is no other basis upon which to conclude that this jury relied upon the allegedly prejudicial evidence to reach their verdict. Given all of the foregoing, a new trial is not warranted on the basis of improperly admitted evidence as to Stowe's sexual history.

## VI. Court's Rulings and Statements Did Not Deprive Stowe of a Fair Trial

Plaintiff also alleges that the Court exhibited antipathy toward her case to such an extent that she was deprived of a fair trial. Specifically, she alleges that the combination of disparate treatment of the parties' medical experts and lenient treatment of defense counsel showed the Court's antipathy or bias against Stowe to the jury. (Pl. Mem. at 24.)

A new trial is warranted on grounds of judicial bias only if "the judge's behavior was so prejudicial that it denied [a party] a fair, as opposed to a perfect, trial." *Shah v. Pan Am. World Services, Inc.*, 148 F.3d 84, 98 (2d Cir.1998) (quoting

*United States v. Rosa*, 11 F.3d 315, 343 (2d Cir.1993)) (alterations in original). "Specific remarks and rulings cannot be viewed in isolation," rather the alleged improper conduct must be viewed in context of the entire record. *Szafran v. Sandata Technologies, Inc.*, 205 Fed.Appx. 864, 868 (2d Cir.2006). The record does not reflect that the Court made improper or biased rulings against Stowe, and as such, did not conduct the trial in a manner so prejudicial as to deprive her of a fair trial.

### A. Treatment of Medical Experts

Plaintiff contrasts and compares my treatment of her expert, Dr. Bleicher, and defendant's expert, Dr. Crane, to support her position that I was biased against her case. Plaintiff argues first that a credibility instruction given after Dr. Bleicher was accepted as an expert, but not similarly given upon accepting Dr. Crane as an expert conveyed that Dr. Bleicher's testimony should not be accepted, and "implicitly conveyed the Court's endorsement of Amtrak's case." (Pl. Mem. at 25.) She also contends that I unfairly limited her cross-examination of Dr. Crane regarding a previous case, but allowed defendant wider latitude. Finally, she argues that I controlled questioning of the experts in a biased way. The medical experts were not treated disparately, and thus, my actions could not have broadcast bias to the jury.

#### 1. Credibility Instruction

As to the credibility instruction, the logical leap made by plaintiff here is untenable—that a credibility instruction actually evinces to the jury that a witness is incredible. Here, upon accepting Dr. Bleicher as an expert in physiatry, I gave a credibility instruction that the jurors would ultimately make a determination as to whether to accept or reject his testimony. Nothing about that statement alone implies that a witness is incredible. It is virtually identi-

cal to the instruction given at the end of trial regarding *all* expert witnesses (and treating physicians), and plaintiff did not object to that instruction. The instruction counterbalances the possibility that a juror may hear the word "expert" and mistakenly believe that such a designation means that the testimony of that person is incontrovertible. The instruction gives the option to either accept or reject the opinions, thus neutralizing any suggestion to the jury that a credibility instruction signals issues with someone's veracity.

The fact that the instruction was not given again when Dr. Crane was accepted as an expert, (Tr. at 635–36), is of little import.[20] Dr. Bleicher was the first expert the jurors heard. As explained, the purpose for such a limiting instruction is to ensure that jurors do not mistakenly believe that they are bound to accept an expert's testimony merely because they are told the person is an expert. Having already made this point to the jury, it was unnecessary to re-instruct when Dr. Crane was accepted as an expert. It is also of note that I gave no credibility instruction during the reading of Dr. Wardell's deposition testimony where there was no objection to his being admitted as an expert. (*Id.* at 720.)

Moreover, the instruction with respect to Dr. Bleicher cuts both ways. He was the only expert whose qualifications were genuinely contested at trial. The jury heard extensive questioning calling into doubt Dr. Bleicher's credentials. The instruction as much legitimized Dr. Bleicher's standing as an expert, as it prevented the jurors from presuming expert testimony is incontrovertible. The credibility instruction was given to clarify a legal issue "and thus minimize possible confusion in the jurors' minds" and not to undermine Dr. Bleicher's credibility. *Szafran,* 205 Fed.Appx. at 869. The instruction was neutral on its face, and not improperly given.

### 2. *Previous Inadmissible Reports*

Plaintiff's objection to the way I handled questioning of Dr. Bleicher and Dr. Crane about prior inadmissible reports fails to recognize the differences between the way counsel broached the subject. The only information relevant to Stowe's case contained in those prior actions was the rejection of the experts' reports and the prior courts' reasons for so doing. A limited amount of information was permitted to refresh the doctors' memories about each case, but beyond a general statement, further details were irrelevant and excluded. A comparison of the colloquies that took place highlights the impropriety of plaintiff's counsel's approach.

To summarize defendant's colloquy: Counsel asked Dr. Bleicher whether he knew of any time a court found his expert opinions inadmissible. Upon Dr. Bleicher's response that he was not, counsel gave the name of the case (*Perl v. Meher*) and stated that "[i]t was an automobile accident" and a decision from January 6, 2010. Counsel explained the court's finding that Dr. Bleicher's affirmation was inadmissible, and upon Dr. Bleicher's denial of having seen it, showed him the case. Dr. Bleicher volunteered that the reason for its inadmissibility was lack of range of motion numbers and that the exam took place in 2005. I directed counsel to move on, and so the colloquy ended. I also noted that plaintiff's counsel would have the opportunity to clear up any relevant facts. (*See* Tr. at 226–28.)

---

**20.** Aside from the substantive problems with this argument, plaintiff also failed to note any objection to the instruction when it was given in relation to Dr. Bleicher or to the lack of instruction given when Dr. Crane was accepted as an expert.

To summarize plaintiff's colloquy: Counsel asked Dr. Crane if he recalled "examining a little boy named [M]anual Peguero," and upon Dr. Crane's request for more information, explained that "[h]e was an eight-year-old boy who was struck by a husband." Defense counsel requested that Dr. Crane simply be shown the decision—I overruled the request. Dr. Crane again asked for more information to refresh his recollection. Counsel offered in return to read straight from the case and began "On April 12, 2007, Anna and her eight-year-old son...." Counsel was stopped before proceeding further and instructed to show the witness the decision since "the jury [didn't] need to know the specifics of the case ... just what the Court found with respect to [the] issue" of inadmissibility of his report. Counsel offered to publish it to the jury. I again instructed, "just the witness." After technical difficulties, I directed counsel to simply bring the decision to Dr. Crane so he could review it. Counsel again said "I can just ask him," but I repeated the instruction to bring it to Dr. Crane. As he showed the decision to Dr. Crane, counsel started to narrate: "This is the case Supreme Court of New York, Kings County." I directed counsel to just allow the witness to review the case. After reviewing the case, Dr. Crane said he had not seen it before, but that it was his understanding that the boy's case was thrown out. Counsel then properly pointed out the reason the court found Dr. Crane's report to be inadmissible—failure to compare his findings to normal ranges. No objection was made, nor sustained in regard to this question. Counsel tried to continue on to specifics of the case: "Do you recall, in that case, finding that this little—the boy whose...." Defendant's objection was sustained, and I explained to counsel that the "[o]ther case has nothing to do with this. It's [the] Court's finding that Dr. Crane submitted an inadmissible affidavit that lacked objective findings.

That's what the jury needs to consider in assessing his testimony here." (*See id.* at 670–76.)

Plaintiff's contention that Amtrak was permitted to question Dr. Bleicher at great length about the case in which his report was found inadmissible is not only contradicted by the record, but it is clear that I permitted plaintiff to address *exactly the same issue* as defendant. What plaintiff was consistently prevented from doing was bringing in details about the substantive claims of the prior case, which were entirely irrelevant to Stowe's claims and Dr. Crane's credibility. Defendant was not similarly stymied because counsel made no attempt to bring in superfluous information. Plaintiff's characterization that I "severely limited any questions or testimony regarding the previous court's ruling" ignores the fact that her counsel tried to go beyond what had relevance to her case, and that I permitted Amtrak to go no further than plaintiff during its colloquy of Dr. Bleicher. I did not prevent plaintiff from inquiring about or referencing the fact that another court found Dr. Crane's report inadmissible; I, in fact, reiterated on the record that was the point plaintiff was making, and what the jury should consider in assessing Dr. Crane's testimony.

As for the "curt series of commands" to plaintiff's counsel, counsel's repeated disregard of my instructions left me no choice. Repeated instruction to counsel was necessary here to prevent the disclosure of irrelevant information. *Ullman v. Starbucks Corp.*, 152 F.Supp.2d 322, 327 (S.D.N.Y.2001) (trial court entitled to act to "confine counsel to evidentiary rulings").

### 3. *Controlling Experts*

Plaintiff also complains that I controlled questioning of the expert witnesses in a biased manner. The trial court has "wide latitude" in controlling the presenta-

tion of evidence "to promote the effective ascertainment of the truth." *Manley v. AmBase Corp.,* 337 F.3d 237, 247 (2d Cir. 2003). This includes participating in the questioning of witnesses, so long as the court's involvement is aimed at aiding the jury in its factfinding duties and does not cross the line to advocating for either side. *United States v. McCallum,* 348 Fed.Appx. 693, 696 (2d Cir.2009). The trial judge may also act to "ensure the orderly presentation of evidence." *Ullman,* 152 F.Supp.2d at 327 (quotations omitted). Here, the "controlling" of expert witnesses amounted to nothing more than the Court intervening to aid the jury's factfinding duties and ensure the smooth running of trial.

First, Stowe contends that Dr. Crane was permitted to give "long-winded, non-responsive answers" on cross examination, but Dr. Bleicher was instructed to give yes or no answers only. During defendant's voir dire of Dr. Bleicher, I sua sponte instructed Dr. Bleicher that counsel was "entitled to yes or no answers *to the extent that [he could] give them."* (Tr. at 222 (emphasis added).) This instruction came after a tedious colloquy on a very simple question—whether Dr. Bleicher could admit patients to the hospital:

Q: Doctor, am I correct you do not have any hospital privileges?

A: Not anymore. For the last two years my practice is a conservative treatment of musculoskeletal problems. As I mentioned before, I don't have any patients to admit for inpatient treatment and I discontinued my volunteering services to the Lutheran Hospital two years ago.

Q: So you can't—you can not admit patients to a hospital, isn't that correct?

A: If I need to, I will.

Q: Doctor, we'll get through this a lot quicker, I know you are used to testifying, but we'll get through this a lot quicker if you answer my questions yes or no to the extent that you can. All right?

A: Yes.

Q: You are not able to admit a patient to a hospital, is that correct?

A: Not if it's not needed.

Q: So the answer to my question is yes?

A: If it needs for my patient to be admitted to the hospital, I will admit.

Q: Are you allowed to admit a patient to the hospital or do you have to refer them to a different doctor?

A: I will refer to a different doctor.

Q: So your answer under oath before this jury is not that you would admit them to the hospital, that you would refer them to a doctor who does have hospital privileges, yes or no?

A: You are correct.

Q: You see it's much simpler that way, doctor. Second, you are not allowed to treat patients in a hospital, are you?

A: I don't treat—people don't have musculoskeletal problems in the hospitals. It's in an outpatient setting.

Q: Let's go through this one more time.

THE COURT: No, let's not.

(Tr. at 221–22.) Dr. Bleicher's responses were not only unnecessarily long-winded, they were unresponsive. Dr. Bleicher was avoiding simple and direct questions, which required defendant to re-ask and reiterate those questions, unnecessarily prolonging his testimony. An instruction from the Court was necessary to move his testimony along. A review of Dr. Crane's testimony reveals that he was not similarly evasive in responding to plaintiff's questions, though occasionally adding tidbits to his "yes or no" responses. Because Dr. Crane answered the questions asked, however, an instruction from the Court was

unnecessary to similarly move his testimony along.[21]

Plaintiff also complains that her counsel was at times directed to let Dr. Crane finish, but does not cite specific examples; I can find only one such instance. On re-cross-examination, plaintiff asked again about Dr. Crane's previously inadmissible report. Upon hearing Dr. Crane explain his understanding of why his report was ruled inadmissible, plaintiff's counsel re-characterized the testimony stating: "Putting in the basis of your findings, you say, is a nuisance?" (*Id.* at 702.) Dr. Crane began explaining, in response, what he meant by the testimony, however, counsel cut in as Dr. Crane continued. At that point, I directed counsel to let Dr. Crane finish.

The Court's participation in this colloquy was aimed at ensuring the jury had accurate information to assess Dr. Crane's credibility since it was clear that a simple "yes or no" response would not have accurately answered counsel's question, and since there was a real danger that the characterization of Dr. Crane's testimony would not be clarified since direct, cross, re-direct, and re-cross-examination had already been undertaken. Allowing Dr. Crane to finish his answer did not cross the line to advocacy on Amtrak's behalf, especially considering that the direction intimated no new questions or how Dr. Crane should finish his response.

Finally, Plaintiff asserts that I allowed certain types of questions to be asked of

Dr. Bleicher, but prohibited the same types of questions from being asked of Dr. Crane. Plaintiff cites an example of a colloquy allowed between Dr. Bleicher and defense counsel and two colloquies during which an objection was sustained against plaintiff's counsel while questioning Dr. Crane. (Pl. Mem. at 25–26.) Plaintiff's examples presume that either there was something improper with the defense colloquy, or that there was nothing improper about her counsel's colloquies—she does not explain which. In the identified colloquies, both sides were trying to highlight information that each expert's direct testimony left out. However, the objections to plaintiff's questions were sustained because they were argumentative. Defendant's question was not. Moreover, plaintiff did not even object to defendant's question during trial.

Given that the medical experts were not treated unfairly during the course of trial, none of these complaints warrants a basis for a new trial.

### B. *Lenient Treatment of Defense Counsel*

Plaintiff claims that in addition to unfairly treating Dr. Bleicher, I treated defense counsel leniently despite his disregard for my rulings and his personal attacks and argumentative behavior throughout the trial. Initially, plaintiff argues that defendant disregarded my rulings regarding Stowe's sexual history,

---

**21.** At one point, plaintiff's counsel requested that I instruct Dr. Crane to answer his questions. I instead instructed Dr. Crane not to talk over counsel because he had in fact been answering counsel's questions. For example:

Q: This is from an office of an orthopedic surgeon; correct?
A: Yes.
Q: And to make sure I understand, Dr. Miller found Ms. Stowe had tenderness at the base of the neck on the left; right?

A: Yes. That's a subjective complaint.
Q: Dr. Miller found forward flexion and extension of [Ms.] Stowe's neck were limited, isn't that correct?
A: Yes, he noted that.
MR. P. MOODY: Your Honor, could he answer my questions, please.
THE COURT: He said, "Yes, he noted that."
(Tr. at 650.)

but the propriety of defendant's actions has already been discussed in great detail herein, and need not be further addressed. Suffice it to say that this is no more a basis for reversal on grounds of bias than it is prejudicial information that was improperly admitted. Additionally, the discussions about the admissibility of Stowe's medical records and objections to those records took place outside the jury's presence or at sidebar, so no rulings related to that subject have bearing on whether my alleged antipathy towards plaintiff's case was somehow broadcast to the jury.

Plaintiff also cites twelve statements made by defense counsel during opening and closing arguments as being a personal attack or argumentative. (Pl. Mem. at 27–28.) It is notable that I sustained an objection to the first statement plaintiff cites, which was made during opening arguments. Of the rest, Plaintiff failed to object at trial to any statements about which she now complains. Plaintiff's argument, then, is that I exhibited prejudice by *not* sua sponte intervening on her behalf. My lack of sua sponte intervention on plaintiff's behalf did not evince partiality for either side, and so could not have become a determining factor for the jury. *McCallum,* 348 Fed.Appx. at 696 (where the record demonstrates "that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury," judicial bias warrants a new trial).

Moreover, although many of the statements raised in plaintiff's motion were "hardly commendable," *Marcic v. Rei-*

*nauer Transp. Companies,* 397 F.3d 120, 127 (2d Cir.2005), and had counsel objected I may well have sustained some of those objections, the stray comments made during defendant's summation spanning thirty-pages of transcript after a week-long trial did not "so infect [the] trial with undue prejudice or passion as to require [a new trial]." *Id.* at 124 ("[W]here the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial.").

\* \* \*

Notwithstanding the fact that there was no biased treatment of the experts or lenient treatment of defendant, I instructed the jurors at the end of trial that they "should not interpret anything I . . . said or [did] as expressing an opinion about the facts." (Tr. at 1049.) And so even if it is possible that some rulings, though properly made, could have conceivably resulted in an inference by the jury that I felt one way or another about the case, they were instructed to disregard those things. And since jurors are presumed to follow the court's instructions, a new trial is not warranted on this basis. *See, e.g., Luca v. County of Nassau,* 344 Fed.Appx. 637, 639 (2d Cir.2009) (denying new trial where trial judge counterbalanced a pointed and impartial comment with a curative instruction).

### VII. *Alleged Jury Misconduct Does Not Require New Trial*

Finally, plaintiff asserts that she is entitled to an evidentiary hearing to determine whether prejudicial information was in fact brought to the jury's attention, and thus whether a new trial may be warranted on the basis of juror misconduct.[22] (Pl. Mem.

---

**22.** Plaintiff asserts that she is entitled to a new trial on the basis of her attorney's affidavit alone. The affidavit of plaintiff's counsel regarding his recollection and understanding of what a juror told him does not satisfy me that the jury heard and relied upon extrane-

ous prejudicial information. Accordingly, I will only address plaintiff's request for an evidentiary hearing to determine whether extraneous prejudicial information was introduced to the jury during their deliberations.

at 29–30.) Plaintiff's counsel, Willard J. Moody, Sr., states that upon speaking with the jury after the verdict, he learned that Juror Number Three[23]

> participated in the discussion with the other jurors concerning whether or not Ellicia Stowe's injuries were valid and he had been able to do this because he had some training with regard to ... the upper part of the body, and that this training or information ... permitted him to understand the difference between objective and subjective symptoms and that he had explained to the other members of the jury the difference, and why the injuries complained about by Ms. Stowe were not objective.

(Pl. Mem., Exh. L.) Defendant asserts that the request for an evidentiary hearing to explore whether the jury was exposed to extraneous information is procedurally deficient due to the delay in raising the issue with the court. Although defendant's assertion arguably raises a basis for dismissing plaintiff's contention for untimeliness, plaintiff's argument fails on the merits in any event.

▬ Courts must balance the need to ensure that the parties received "a fair trial, with a verdict based only on properly admitted evidence" against the general policy disfavoring investigation of and interference with jury deliberations. *Cocconi v. Pierre Hotel,* 146 F.Supp.2d 427, 429 (S.D.N.Y.2001). Accordingly, "probing jurors for 'potential ... misconduct or extraneous influences' after they have reached a verdict is justified 'only when reasonable grounds for investigation exist,' in other words, where there is 'clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial.'" *United States v. Stewart,* 433 F.3d

273, 302–03 (2d Cir.2006) (quoting *United States v. Moon,* 718 F.2d 1210, 1234 (2d Cir.1983)). Here, there is no clear, strong, substantial and incontrovertible evidence of specific, nonspeculative impropriety sufficient to justify probing into the jury deliberations.

Plaintiff argues that Moody's vague assertions that Juror Number Three had some specialized knowledge or training that helped him understand the difference between objective and subjective symptoms is evidence that Juror Number Three acted as a "non-testifying expert" in the jury room, discussing "extra-record facts." (Pl. Reply at 15.) First, the attorney affidavit amounts to nothing more than self-serving hearsay, which is not clear and strong evidence to support hauling the jurors back here to probe jury deliberations in search of evidence sufficient to set aside the verdict. *Severino v. Am. Airlines,* No. 07–CV–941, 2009 WL 1810014, at *3 (S.D.N.Y. June 24, 2009); *United States v. Abcasis,* 811 F.Supp. 828, 835–36 (E.D.N.Y.1992). On this basis alone, plaintiff's motion fails.

But even accepting the affidavit, plaintiff's motion fails. Moody's statement that Juror Number Three had some training or knowledge is too vague to infer that this juror held himself out as an expert or even had any specialized medical knowledge or training, which he used to improperly influence the deliberations. Moody did not even identify a potential source of this "training" beyond Moody's understanding that it had something to do with the "upper part of the body."

I note, instead, that Juror Number Three expressed an interest in "fitness" during voir dire—an interest that plaintiff's counsel chose not to explore upon

---

**23.** Although plaintiff does not so identify the juror in question, it is clear from her physical description, description of his answers during voir dire, and his seat during the trial that she indeed is referring to Juror Number Three.

questioning the panel. (Transcript of Jury Selection at 57.) This interest seems a likely source of the alleged "training or information" about the upper body. Rather than evince expert-level knowledge brought to bear on the jury's decision, Moody's allegations evince no impropriety, but merely that Juror Number Three relied upon common knowledge derived from his life experiences during deliberations, which jurors are both permitted and expected to do. *See, e.g., Corines v. Superintendent, Otisville Correctional Facility*, 621 F.Supp.2d 26, 39–40 (E.D.N.Y.2008) (agreeing with state court decision that it was not improper for a nurse to make general statements about IV procedures during jury deliberations since she merely gave her lay opinions based on her life experiences and the testimony); *United States v. Chin*, 275 F.Supp.2d 382, 384–85 (E.D.N.Y.2003) (finding that it was not improper for a juror to discuss Chinese family values since it was part of the fund of ordinary experience in the community); *Cocconi*, 146 F.Supp.2d at 432–33 (finding that it was not improper for a corporate travel consultant to share knowledge regarding the reputation of hotels during deliberations).

Even if Juror Number Three improperly introduced extraneous information, the court still "must apply an objective test, assessing for itself the likelihood that the outside influence would affect a typical juror." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994). In the instant case, the difference between subjective and objective symptoms was explained in detail to the jury by the medical experts. (Tr. at 248, 587–88, 594, 601, 605, 653, 676–78, 729; Levy Dep. at 133–34, 140–41.) The jury also repeatedly heard the experts categorize Stowe's symptoms as subjective, and reiterate that various objective findings of abnormality or injury were not present. (*E.g.*, Tr. at 588–90, 592, 594, 596, 598 729–30, 732, 750.) Thus, even the most generous reading of the attorney affidavit would establish only that cumulative extraneous information entered the jury room.

Since the jury heard repeated, competent, accessible testimony from qualified medical experts regarding Stowe's subjective and objective symptoms in relation to her claimed injuries, it is highly unlikely that cumulative information from a fellow juror would have affected the typical juror's decision. *See Chase Manhattan Bank, N.A. v. T & N PLC*, 162 F.3d 1147 (2d Cir.1998) (table decision), *available at* 1998 WL 634218, at *3 (affirming district court decision that jurors exposure to a newspaper article regarding the case that merely repeated testimony at trial was not prejudicial); *Cocconi*, 146 F.Supp.2d at 436 ("Extraneous information is ·nonprejudicial if it is cumulative of properly admitted evidence . . . .").

Since there is no evidence, let alone clear, strong and substantial evidence, that extraneous prejudicial information came to bear upon the jury's verdict, an evidentiary hearing on the matter is unwarranted, as is a new trial on the basis of juror misconduct.

### CONCLUSION

For all of the foregoing reasons, plaintiff's motion for a new trial is denied. The Clerk of Court is respectfully requested to enter final judgment in defendant's favor.

**SO ORDERED.**